**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

JEANNE STROUP; and
RUBEN LEE,

    Plaintiffs,

v.

UNITED AIRLINES, INC.,

    Defendant.

___

**COMPLAINT AND JURY DEMAND**
___

Plaintiffs, by and through undersigned counsel, respectfully allege for their Complaint and Jury Demand as follows:

## I. INTRODUCTION

1. On November 18, 2013, Defendant United Airlines, Inc. ("United" or the "Company") unlawfully and willfully terminated flight attendants Ruben Lee and Jeanne Stroup because of their ages.

2. Mr. Lee and Mrs. Stroup had 70+ years of combined experience with United when the Company fired them for the pretextual reason that they watched an iPad video for approximately 15 minutes intermittently and failed to wear aprons during one flight in September 2013.

3. In approximately 70 years of combined service to United, and until this September event, neither Mr. Lee nor Mrs. Stroup had ever received a disciplinary write-up, but had earned numerous accolades from coworkers, superiors, and satisfied customers.

1

4. As a result of Defendants' illegal conduct, Plaintiffs have suffered loss of wages and benefits, humiliation, severe emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

## II. JURISDICTION AND VENUE

5. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. The employment practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

7. This action is authorized and instituted pursuant to the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621, *et seq*.

## III. ADMINISTRATIVE PREREQUISITES

8. Plaintiffs timely filed Charges of Discrimination with the Equal Employment Opportunity Commission and have received their Notices of Right to Sue. Thus, all administrative prerequisites have been met and exhausted. This case is timely filed.

## IV. PARTIES

9. Jeanne Stroup is a citizen of the United States and was, at all relevant times, a resident of and domiciled in the State of Colorado, and a current or former employee of United.

10. Jeanne Stroup was born on September 6, 1958.

11. Ruben Lee is a citizen of the United States and was, at all relevant times, a resident of and domiciled in the State of Colorado, and a current or former employee of United.

12. Ruben Lee was born on January 24, 1952.

13. Defendant United Airlines, Inc. has continuously been an employer within the meaning of the ADEA at all relevant times.

V.      FACTUAL ALLEGATIONS

**Jeanne Stroup's 35-year career with United**

14.     Mrs. Stroup devoted her entire career to United, working for the Company for approximately 35 years, including 29 years as a flight attendant.

15.     Throughout her lengthy tenure with United, Mrs. Stroup took pride in providing its passengers with superior service, and repeatedly earned recognition from customers and United superiors for her considerable professional achievements.

16.     Additionally, Mrs. Stroup never received a customer complaint during her career with United and, until September 2013, was never formally disciplined by United. Her performance in all categories was consistently commendable.

17.     In 1978, just two years after graduating from high school, Mrs. Stroup began working for United as a Reservation Representative in Denver. Despite her young age, Mrs. Stroup quickly earned respect and confidence from her subordinates and management. She had a particular knack for understanding the reservation computer system and complicated fare structures.

18.     As a result, Mrs. Stroup was promoted to the position of Technical Support Representative in 1982. Mrs. Stroup performed exceedingly well in this position for the next two years and received letters of praise from her supervisors and managers.

19.     In 1984, Mrs. Stroup decided she was ready for a new challenge at United, and applied for and received an internal flight attendant position based in Denver.

20.     As a flight attendant, Mrs. Stroup again proved herself to be a highly capable United employee. She was thorough and efficient, and had stellar safety and attendance records. Mrs. Stroup flew approximately 30,000 flight hours without incident, and only missed one

check-in during her 29-year tenure despite commuting from her home to the Denver airport throughout 29 often-snowy winters.

21. Also, Mrs. Stroup was one of just a handful of her coworkers who returned to work immediately after the distressing events of September 11, 2001, while the safety of air travel was still very much in question.

22. In recognition of her consistently outstanding performance, Mrs. Stroup received numerous customer satisfaction memos during her tenure with United, along with multiple Certificates of Appreciation from United management for her top-notch customer service. United also gave Mrs. Stroup a number of awards for her superb attendance/dependability record.

### Ruben Lee's 40-year career with United

23. Mr. Lee devoted his entire career to United, loyally and successfully working as a domestic flight attendant for approximately 40 years.

24. During his decades-long tenure with United, Mr. Lee received multiple awards and prestigious assignments because of his stellar customer service, enthusiasm, loyalty, and attention to safety issues.

25. Mr. Lee began his long career with United stationed in New York City, and received numerous prestigious assignments during this time. For instance, Mr. Lee was given the important duty of modeling new flight attendant uniforms, which involved taking time off from his regular flying schedule and traveling to Chicago to present the uniform to the United Board of Directors.

26. Additionally, Mr. Lee auditioned for and was awarded the position of drummer for the Magnificent 7000 Road show. Mr. Lee and other coworkers who were selected to be part of the show traveled around the United States for roughly one year performing and representing

United at inflight flight attendant meetings. Mr. Lee received a silver chalice engraved with the moniker "The Magnificent 7000" for his enthusiastic participation in the show, which was signed by then-President of United, Edward Carlson. Subsequently, Mr. Carlson never failed to send Mr. Lee a Christmas card personally signed by him and his wife until Mr. Carlson retired from the Company.

27. In 1974, Mr. Lee was working a flight from New York to Milwaukee as the number 3 flight attendant on a 727 QC, a plane that carries cargo at night and converts to a passenger aircraft during the day, when the crew discovered that the plane could not land normally because the nose gear would not deploy. Consequently, the plane was diverted to Dulles International Airport in Washington, D.C., where it made an emergency landing and slid to a stop. During this terrifying ordeal, Mr. Lee bravely helped deploy the emergency slides and evacuate all the passengers to safety. United gave Mr. Lee an award for his extraordinary performance.

28. In 1975, United selected Mr. Lee to be the Employment Representative assigned to help hire new flight attendants in Boston, New York, and Newark.

29. Shortly thereafter, Mr. Lee again distinguished himself by pioneering a new method of cart setup for in-flight food and beverage services. United was so impressed by Mr. Lee's initiative and innovation that the Company decided to implement his method in all its New York-based domestic flights.

30. Also in approximately 1975, United scheduled two special Anchorage charter flights for VIPs of Standard Oil and Exxon, and four flights attendants per flight were selected. Mr. Lee was chosen to work both flights.

31. On April 7, 1976, Mr. Lee transferred to United's Denver domicile.

32. Shortly after Mr. Lee's transfer, the United Airlines Emergency Training Team asked him to be an actor in the emergency procedures recurrent training videos. Mr. Lee eagerly agreed to do so, and appeared in two widely-distributed videos.

33. In 1984, Mr. Lee was selected for a special assignment as Supervisor of Inflight Crew Resources, overseeing Denver, Washington, and Cleveland's day-to-day operations for flight attendants. Mr. Lee's responsibilities included issuing bid packages for flight attendants, scheduling hotels, and supervising three crew schedulers. This prestigious assignment lasted six months.

34. At the end of 1985, United awarded Mr. Lee the Domicile Achiever Award for his work as a purser on DC 10s and 747s.

35. Then, from 1988 to 1991, United selected Mr. Lee to work the Denver Broncos football team charters. It was a privilege to be one of the few flight attendants chosen to be part of the Broncos' crew, especially considering that the Broncos played in two Super Bowls during this time.

36. In 1990, United added the new Boeing 777 to its fleet. Because United management so highly valued Mr. Lee's experience as a purser, he was asked to fly the purser position on an FAA certification run of this new aircraft. Mr. Lee was subsequently selected to fly as a working crewmember on the inaugural flight of the 777 from Washington to Chicago and Chicago to Denver.

37. For the remainder of Mr. Lee's career with United, he continued to consistently achieve a high standard of performance with respect to all his job duties, including those related to both safety and customer service.

38. Mr. Lee never received a customer complaint during his tenure with United and, until September 2013, was never formally disciplined by United.

39. The exceptional service Mr. Lee reliably provided to customers kept him in the upper five percent of flight attendants receiving commendations from United passengers, known as "Orchid Letters." As a result, Mr. Lee also received numerous Certificates of Appreciation from his superiors at United.

**The September 20, 2013 flight**

40. On September 20, 2013, San Francisco Inflight Supervisor Deepesh Bagwe allegedly observed Mr. Lee and Mrs. Stroup violating United flight attendant guidelines during flight 721 from Denver to San Francisco as part of an Unannounced Excellence Review. Their so-called rule violations were exceedingly trivial, as explained below, and came on the heels of Plaintiffs' more than 70 years of combined successful service to United.

41. United used Plaintiffs' purported rule violations as a pretextual basis to fire them when, in reality, United terminated them because of their ages.

42. San Francisco Inflight Supervisor Bagwe emailed his purported "observations" of Mr. Lee's and Mrs. Stroup's conduct during the September 20 flight to Denver Inflight Supervisor Mark Dodge. Bagwe alleged that both failed to wear their aprons and watched an iPad video for approximately 15 minutes.

43. Upon information and belief, Denver Inflight Supervisor Dodge had ordered San Francisco Inflight Supervisor Bagwe to scrutinize Plaintiffs' – and only Plaintiffs' – actions during the September 20 flight because of their ages, and to create a pretextual basis to terminate them. That is exactly what Bagwe did.

44. On October 7, 2013, Mr. Lee and Mrs. Stroup each received a Letter of Charge from United, accusing them of various disciplinary infractions, all of which were very minor, and some of which they did not commit.

45. The Letter of Charge level of discipline is the most serious discipline United issues to its employees, short of unpaid leave or termination, and is one of four levels of discipline described in Plaintiffs' Collective Bargaining Agreement ("CBA") with United. Therefore, United failed to apply the progressive discipline procedures to Mr. Lee and Mrs. Stroup provided for in (among other places) its CBA with them.

46. Additionally, during United's "investigation" in fall 2013, United failed to provide Plaintiffs with all relevant documentation relating to their alleged offenses, including a letter praising their performance during the September 20 flight authored by Bill Knudsen, the Lead Purser during that flight. United's failure to produce relevant documents to Plaintiffs violated its CBA with Plaintiffs, and compromised Plaintiffs' ability to mount an effective defense against their disciplinary charges.

47. Among other things, Mrs. Stroup and Mr. Lee capably performed the following key duties at all phases of the September 20 flight: (1) interacted with customers using positive interaction skills such as making eye contact and using pleasant facial expressions and tone of voice; (2) remained visible in the cabin and accessible to customers wishing to capture their attention; (3) when traversing the aisle, they walked slowly and were available to customers; (4) promptly responded to customer and interphone call chimes; (5) resolved all situations within their control without placing blame on co-workers; and (6) provided customer service in an invariably courteous, helpful, competent, dependable, and business-like manner.

48. Adding further insult to the situation, United prohibited Mr. Lee and Mrs. Stroup from picking up any extra hours and failed to pay their usual meal expenses during the disciplinary process in October 2013 - November 2013, resulting in drastically reduced pay relative to normal.

49. From the start of United's sham "investigation" of Mr. Lee and Mrs. Stroup in late 2013, they candidly admitted responsibility for the trivial internal rule violations that they actually committed during the September 20, 2013 flight, specifically, watching an iPad video intermittently for about 15 minutes and not wearing aprons while providing food and beverage service.

50. Plaintiffs' trivial rule violations during one flight were not offenses that warranted the terminations of such devoted employees. United nonetheless latched onto these offenses and used them as a pretextual basis to fire both Mr. Lee and Ms. Stroup, despite being aware of their many decades of consistently successful service to the Company.

51. Additionally, as Mr. Lee and Mrs. Stroup explained to United during its "investigation" in late 2013, they never were inattentive to customers' needs or safety during the September 20 flight because they viewed the video *after* providing regular cabin service and, even then, only watched the iPad intermittently and continued to adhere to the internal policy of walking through the cabin every 15 minutes.

52. As Mr. Lee and Mrs. Stroup also noted during United's "investigation," they did not knowingly violate any policy when they briefly watched the iPad video. Both rationally thought the rule was the same for flight attendants as it was for the passengers – that the use of electronic devices including iPads was acceptable once the "sterile flight deck period" was over (taxi, takeoff, landing, and all flight operations conducted below 10,000 feet).

53. Moreover, FAA regulations at the time allowed this very conduct, United now <u>expressly permits</u> its flight attendants to use personal electronic devices while onboard the aircraft with passengers present for business purposes, and United will soon begin <u>providing</u> its flight attendants with iPhones .

54. In addition, Mr. Lee and Mrs. Stroup made it clear to United during its "investigation" of them that the Company had falsely accused him of all the other minor "offenses" at issue.

55. Mr. Lee and Mrs. Stroup defended themselves against United's pretextual charges in the manner described above at various times during United's "investigation," including at a November 5, 2013 disciplinary conference before Denver Inflight Supervisor Dodge, Director of Inflight Services Denver/New York Dean Whittaker, and Association of Flight Attendants-CWA representative Ken Kyle.

**The events immediately preceding Plaintiffs' terminations**

56. Given the universally minor nature of Mr. Lee's and Mrs. Stroup's purported disciplinary infractions and their full acceptance of responsibility for the minor "offenses" they actually committed during the September 20 flight, they had done nothing that merited actual or constructive termination – particularly considering their long and successful careers with United. However, that is precisely what happened in November 2013 when United fired them for the pretextual reason that they watched an iPad video for approximately 15 minutes and failed to wear aprons during one flight in September 2013.

57. On Friday, November 15, 2013, after business hours, Mr. Lee and Mrs. Stroup both received calls from AFA Representative Kyle, during which they received ultimatums that

United would send letters of termination out to each of them on November 19, 2013, if they did not retire by Monday, November 18, 2013.

58.     AFA Representative Kyle explained that he talked to Director of Inflight Services Denver/New York Whittaker earlier that day, and that Whittaker told him United was going to terminate Mr. Lee and Mrs. Stroup immediately.

59.     AFA Representative Kyle also stated to both Mr. Lee and Mrs. Stroup that he convinced United to give them a few days to retire and explained the illusory "options" available to each of them. On the one hand, AFA Representative Kyle said that they could fight their terminations. He explained that the upside to this approach was that they could potentially keep their jobs with United if they prevailed, and the downsides were that it could take a year or more for their appeal hearings to occur, and that they would be treated as terminated employees by United while their appeals were pending, meaning that they would lose their retiree medical benefits along with their retiree pass privileges. Additionally, he advised them that, if they lost their appeals, they would no longer be eligible for retiree medical benefits and retiree pass privileges.

60.     Fighting their terminations was not a feasible option for Mr. Lee or Mrs. Stroup under the circumstances. They reasonably believed having a termination on their employment records would significantly increase their difficulty in finding other jobs – a difficulty further compounded by Mr. Lee's and Mrs. Stroup's ages, as older individuals face particularly significant challenges finding employment. Additionally, Mr. Lee and Mrs. Stroup believed they would lose all the considerable retiree medical and travel benefits they earned during their approximately 35 and 40 years of service, respectively, if United fired them.

11

61. On the other hand, AFA Representative Kyle advised Mr. Lee and Mrs. Stroup that they could submit notices of their retirements to United in lieu of being terminated. He explained that they would not lose their retiree medical benefits if they retired, and that they might also still be eligible for retiree pass privileges. AFA Representative Kyle also stated to each of them that, if you have reached a decision, you should not wait until the last minute to notify United because of the complexity of the internal United system for processing retirement notifications, and the associated risk that their retirements would not become official before United's November 20, 2013 deadline for mailing their written notices of termination.

62. On Monday, November 18, 2013, Mrs. Stroup sent an email to Director of Inflight Services Denver/New York Dean Whittaker asking for his decision in writing – the decision being (as Mrs. Stroup understood it to be), you decided to terminate me unless I retire immediately.

63. AFA Representative Kyle, who was cc'd, sent Mrs. Stroup an email reply asking her to not send emails to her supervisor without first getting his permission.

64. Mrs. Stroup never received a written response to her November 18 email from United.

65. Upon information and belief, Director of Inflight Services Denver/New York Whittaker deliberately failed to respond to Mrs. Stroup's November 18 email so that he personally did not have to state United's ultimatum in writing. Nonetheless, United's ultimatum to Mr. Lee and Mrs. Stroup was abundantly clear.

66. Under the intense duress which United created, Mrs. Stroup and Mr. Lee submitted their notifications of retirement to United on November 18, 2013, in lieu of their imminent terminations.

67. All other options that Plaintiffs understood to be available to them at the time would have left them markedly worse off than retiring.

68. Under the circumstances, Plaintiffs had no reasonable alternative to retiring, and their compelled resignations constitute adverse employment actions.

### United's shifting, inconsistent rationales for Plaintiffs' terminations

90. United has already articulated multiple, inconsistent bases for its decisions to terminate Mr. Lee and Mrs. Stroup. This underscores the pretextual nature of United's proffered reasons for their terminations.

91. First, upon information and belief, Denver Inflight Supervisor Dodge ordered San Francisco Inflight Supervisor Bagwe to scrutinize Mrs. Stroup's and Mr. Lee's every move during the September 20 flight because of their ages. At Denver Inflight Supervisor Dodge's behest, San Francisco Inflight Supervisor Bagwe scrambled to find anything and everything United could use as a pretextual basis to terminate Mrs. Stroup's and Mr. Lee's employment because of their ages, while failing to report the many positive things he observed them doing during the flight.

92. Many of San Francisco Inflight Supervisor Bagwe's baseless initial charges were not even mentioned in Mrs. Stroup's and Mr. Lee's final Letters of Charge.

93. However, in United's Position Statements submitted to the EEOC during its investigation of Mr. Lee's and Mrs. Stroup's cases, a number of San Francisco Inflight Supervisor Bagwe's bogus accusations against them resurfaced, like failing to attend to first class customers and improperly addressing a malfunctioning lavatory.

94. At yet another time, AFA Representative Kyle claimed that Director of Inflight Services Denver/New York Whittaker told him the reason Mrs. Stroup and Mr. Lee were being fired was because they were dishonest during the investigation (also untrue).

95. United's Position Statements to the EEOC abandoned this rationale as well.

### United has targeted its older flight attendants like Plaintiffs for heightened and unwarranted scrutiny.

97. United treated Mrs. Stroup and Mr. Lee more harshly than their similarly situated, mostly younger coworkers who committed comparably trivial infractions to theirs – along with mostly younger flight attendants who committed far more serious rule violations. For instance, Mrs. Stroup and Mr. Lee often observed mostly younger crew members using electronic devices such as cell phones, tablets, nooks, and iPads. Their performance was not compromised, and they were not seriously disciplined (or fired) for it even though, upon information and belief, their supervisors including, in some cases, Director of Inflight Services Denver/New York Whittaker and Denver Inflight Supervisor Dodge, were aware of such behavior.

98. Upon information and belief, Director of Inflight Services Denver/New York Whittaker and Denver Inflight Supervisor Dodge both participated in United's decision to terminate Mrs. Stroup and Mr. Lee because of their ages.

99. Flight attendants also regularly did not wear their aprons at all required times, and Mrs. Stroup and Mr. Lee never observed a coworker being fired for such an "offense."

100. In contrast to Mrs. Stroup's and Mr. Lee's trivial infractions, and towards the end of their careers with United, significantly younger flight attendants than them failed to disarm evacuation slides upon arrival of their aircraft at the gate. This is dangerous because, when the evacuation slide on a door is armed, an inadvertent slide deployment may occur and cause serious injury or death to ground personnel. Yet, the flight attendants who made this serious

error, which violated both internal policy and FAA regulations, never received worse than a level 3 discipline, resulting in a brief suspension, not termination.

101. During the final disciplinary conference on November 5, 2013, Denver Inflight Supervisor Dodge admitted that he pre-arranged for San Francisco Inflight Supervisor Bagwe to travel on flight 721 to specifically observe only Mrs. Stroup's and Ruben Lee's behavior – both of whom were over the age of 54 at the time. This was consistent with a pattern Mrs. Stroup and Mr. Lee observed towards the end of their tenure with United, where United supervisors exclusively would be positioned on the flights worked by older flight attendants, and they would then trump up disciplinary charges against older employees for minor rule infractions that were very common among all flight attendants, and United would use these charges as a pretextual basis to terminate the older employees.

102. The peculiar nature of San Francisco Inflight Supervisor Bagwe's behavior during the September 20 underscores how anxious United management was to try to catch Mrs. Stroup and Mr. Lee violating some rule by subjecting them alone to heightened scrutiny because of their ages.

103. During the flight, San Francisco Inflight Supervisor Bagwe spent an inordinate amount of time loitering in the back galley and watching Mr. Lee's and Mrs. Stroup's every move. San Francisco Inflight Supervisor Bagwe's behavior was so odd that Mr. Lee and Mrs. Stroup grew concerned that he could be a security threat, as they were trained to be aware of possible terrorist individuals taking an unusual interest in crew behavior. They came close to calling the cockpit to alert the pilots to this concern but changed their minds when the seatbelt sign came on for descent. Even after the seatbelt sign came on, Mr. Lee still had to ask San

Francisco Inflight Supervisor Bagwe to take his seat, as he continued to loiter and fixate on their every move in a continued effort to concoct a pretextual basis for United to fire Plaintiffs.

## VI.     STATEMENT OF CLAIMS FOR RELIEF

### CLAIM FOR RELIEF
### (Violation of Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621, *et seq.*)

104.  Plaintiffs hereby incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

105.  Plaintiffs were protected persons under the ADEA at all relevant times.

106.  Defendant treated Plaintiffs less favorably than their similarly situated younger counterparts in the terms and conditions of their employment.

107.  At all relevant times, Plaintiffs performed the functions of their job competently and were qualified for their positions.

108.  Defendant terminated Plaintiffs' employment because of their ages. Age was the motivating factor in Defendant's decision to terminate each Plaintiff.

109.  Defendant's articulated reasons for Plaintiffs' terminations are merely pretext for unlawful discrimination on the basis of their ages.

110.  Defendant constructively discharged both Plaintiffs because a reasonable person in each Plaintiff's position would have felt compelled to resign. All other options that Plaintiffs understood to be available to them would have left them markedly worse off than retiring.

111.  Defendant has engaged in a pattern and practice of age discrimination in the terms and conditions of employment, including but not limited to retaining younger employees who have engaged in similar or worse conduct to Plaintiffs'.

112.  Defendant is liable for the acts and omissions of its agents and employees.

113. Defendant either directly or by and through agents, discriminated against Plaintiffs on the basis of their ages and caused them severe injuries, damages, and losses.

114. Defendant's conduct was the proximate cause of Plaintiffs' injuries, damages, and losses.

115. Defendant's discriminatory conduct was willful and in knowing or reckless disregard of the requirements of the ADEA.

116. As a consequence of Defendant's violation of the ADEA, Plaintiffs have sustained significant economic and consequential damages.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in their favor and against Defendant, and award them all relief as allowed by law, including, but not limited to the following:

   a. Declaratory relief and injunctive relief, as appropriate;

   b. Actual economic damages as established at trial;

   c. Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

   d. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

   e. Liquidated damages for all claims as allowed by law;

   f. Pre-judgment and post-judgment interest at the highest lawful rate;

   g. Attorney's fees and costs; and

   h. Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 29th day of June, 2015

                                              KILLMER, LANE & NEWMAN, LLP

                                              *s/ David A. Lane*_____  
                                              David A. Lane  
                                              Michael P. Fairhurst  
                                              1543 Champa Street, Suite 400  
                                              Denver, CO 80202  
                                              (303) 571-1000  
                                              dlane@kln-law.com  
                                              mfairhurst@kln-law.com

                                              ATTORNEYS FOR PLAINTIFFS

.