------------------------------------------------

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01389-WYD-CBS

------------------------------------------------

Plaintiff(s):

JEANNE STROUP
and RUBEN LEE

                              ^COURT USE ONLY^

Defendant(s):

UNITED AIRLINES, INC.

------------------------------------------------

          VIDEOTAPE DEPOSITION OF RUBEN LEE, JR.

                  August 3, 2016

------------------------------------------------

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 42

1    Q    You reviewed the complaint just now;
2  and I heard you say that you have read the
3  complaint before today as well.  Correct?
4    A    Yes.
5    Q    Are the allegations in the complaint
6  correct?
7    A    Yes.
8    Q    Did you ever have any conflict with
9  co-workers at United?
10   A    Never.
11   Q    Were you ever in a verbal or physical
12 altercation with any co-workers?
13   A    No.
14   Q    Did you ever have any conflict with a
15 customer of United?
16   A    No.
17   Q    Were you ever in any verbal or physical
18 altercation with a customer of United?
19   A    Truthfully, the only thing that comes
20 to mind:  I'm flying a DC-10, Vegas to Denver.  I
21 had a very, extremely nervous passenger on board
22 who kept complaining that someone was after him.
23       So as soon as we touched down in
24 Denver, he bolted from his seat and was running
25 towards the cockpit.  At that time, I tackled him.

Page 43

1       That's the only contact I ever had with
2  a passenger that's adverse.
3    Q    When was that?
4    A    I can't remember specific date.
5       But it was Vegas to Denver, DC-10.  I
6  was sitting at the No. 4 -- Door 4.
7    Q    Was this before or after 9-11?
8    A    Way before.
9    Q    Were you ever demoted at United?
10   A    Never.
11   Q    Was your pay ever cut when you worked
12 for United?
13   A    Only during the bankruptcy.
14   Q    And during that time period, the pay to
15 all flight attendants, regardless of age, was cut,
16 correct?
17   A    This is correct.
18   Q    Did you ever do anything other than --
19 we're going to take the bankruptcy out of the
20 equation -- see your pay rise over time at United?
21   A    With normal pay raises, yes.
22   Q    Did you ever receive any bonuses or
23 incentive pay at United?
24   A    On-time stuff, but everyone got that.
25   Q    Were you ever denied any bonuses or

Page 44

1  incentive pay?
2    A    Not that I know of.
3    Q    Were you ever grieved at United?
4    A    Grieve in what way?
5    Q    Were any complaints made against you?
6    A    I had a Letter of Charge for sick list
7  back in the -- sick list and dependability back in
8  the -- I believe it was '80s.
9    Q    You had a Letter of Charge back in the
10 1980s for what, sir?
11   A    Sick list and dependability.
12   Q    Other than that Letter of Charge, did
13 you ever have any complaints against you?
14   A    Oh, there was a trip I worked as an
15 extra to San Francisco, I believe.  I'm working
16 first class.
17       And there was a passenger in the
18 back -- I remember seating him back in the back
19 because I'm closing bins.
20       And the lady grabbed my attention over
21 on the right side and said, This lady is extremely
22 loud on her phone and cussing and everything else.
23       So I didn't jump; I just listened.  And
24 she totally was extremely profane.  And this woman
25 had a bunch of kids.

Page 45

1       And I asked her, Could you hold it down
2  a little bit?  And she just looked at me and
3  proceeded to do it again, even louder this time.
4  So I asked her again, Will you replace refrain from
5  your language and -- and tone it down.  So, of
6  course, she didn't.
7       So I went and spoke to the purser.
8  They called Inflight -- Excuse me.  They called
9  customer service; and supervisors came out, and
10 they took her off.
11       And days later, a supervisor approaches
12 me and says that -- that incident on board --  I
13 told them my side and everything else.
14       And she says, Well --  She says, You
15 asked her for her phone number.  And I'm, like,
16 Really?
17       So I'm working first class.  I didn't
18 really have time to even -- or even begin to think
19 about it.
20       So they investigated it with the purser
21 out of San Francisco, that particular crew, and
22 came to find out that the young lady who I was
23 working with -- excuse me -- where I was working in
24 the back was standing right behind me and heard
25 everything I said.

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 54

1  down while you're in the aisles?
2       A    Well, upon reading the FOAM (sic) on
3  that, it was brought to my attention.  At that
4  point before then, no, I didn't realize that.
5       Q    Regardless of what's in the FAIM, isn't
6  it fair to say it's kind of common sense not to
7  leave large objects not attached to the floor of a
8  moving airplane when the seat belt sign has gone
9  on?
10      A    I would say -- definitely say yes.  Our
11  carts are not attached to the floor either when
12  we're out in the aisle.
13      Q    What's heavier, a cart or the bin?
14      A    Definitely a cart.
15      Q    What do you consider the role of a
16  flight attendant?
17      A    Oh, wow.  After 41 years of flying, we
18  wear many hats.  It can be a police officer; it can
19  be a medic; it can be a babysitter; it can be a
20  schoolteacher.  It can be everything:  bartender;
21  you name it.  We wear a lot of hats.
22           And, wow, I was really good at it.
23      Q    Is there a primary purpose of a flight
24  attendant?
25      A    We're there for passenger safety, for

Page 55

1  sure; you know, that is encompassed in the whole
2  realm.  Having the emergencies I've had --
3  (Inaudible.)
4           THE REPORTER:  Pardon me?
5       A    Having the emergencies that I've had
6  over the years, yeah, safety is -- is monumental,
7  along with just about every other facet of the job.
8       Q    (By Ms. Martinez)  Is safety the
9  number-one concern of a flight attendant?
10      A    It's right up there, yes.
11      Q    If the number-one concern of a flight
12  attendant is not safety, what is it?
13      A    If the number-one concern of a flight
14  attendant is not safety?
15      Q    Yes.  Then what is the number-one
16  concern?
17      A    Oh, wow.  Our passengers.
18           I mean, from the moment they walk
19  through that door, we're caring for them.  And the
20  way I see them is brother, sister, mother, father.
21           Everything; you want to make sure that
22  they have a good ride and get to Point A and
23  Point B safely.
24      Q    So --
25           THE DEPONENT:  Bless you.

Page 56

1       Q    (By Ms. Martinez) -- after you
2  returned --  Well, let me back up a little bit.
3           When you took the iPad out, where did
4  you put it?
5       A    Inside the cart.
6       Q    Why?
7       A    There was a bit of water or something
8  on the -- on the counter, from what I remember.
9  But I really didn't recall other than that why I
10  set it inside the cart.  It was just easier, I
11  guess.  I don't know.
12      Q    Wouldn't it be easier to just move the
13  debris or dry the water?
14      A    That's possible.
15      Q    Isn't the reason that you put it inside
16  the cart because you didn't want anyone to see that
17  you were watching a video on duty?
18      A    No.
19      Q    So the fact that you put the iPad in
20  the cart and kept it in the cart had nothing to do
21  with whether you thought you should be watching a
22  video; is that your testimony?
23      A    Please rephrase the question -- or
24  repeat the question, please.
25      Q    The fact that you put the iPad in the

Page 57

1  cart had nothing to do with whether or not you
2  thought you should be watching a video on duty?
3       A    Not at all.
4       Q    At that point in time when you put the
5  iPad in the cart, you thought it was perfectly okay
6  to be watching a video on duty?
7       A    Well, at that point, I didn't know that
8  we couldn't watch videos or electronic devices at
9  that moment or in that specific situation in time
10  because everyone was on a flight, otherwise,
11  everywhere across the whole system, wherever I
12  flew.
13      Q    Is it your testimony that it's an
14  excuse to break a rule if everybody's breaking a
15  rule?
16      A    Not at all, ma'am, no.
17      Q    And you realize that there was a rule
18  against flight attendants using personal electronic
19  devices on flights as of September 20, 2013,
20  correct?
21      A    After it was brought to my attention,
22  yes.
23      Q    Well, wasn't it brought to your
24  attention when it was put in the FAIM?
25      A    Well, if I had -- maybe had read it

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 58

1    from cover to cover, yes.
2        Q    You would agree that the policy
3    regarding personal electronic devices is clearly
4    stated in the FAIM?
5        A    Yes, I do.
6        Q    And you would agree that as a flight
7    attendant it is your responsibility to know the
8    policies in the FAIM, correct?
9        A    Yes.
10       Q    And as of September 20, 2013, you were
11   responsible for knowing the policies in the FAIM,
12   which included the policy against flight attendants
13   using personal electronic devices during flight,
14   correct?
15       A    After reading it, yes.
16       Q    So you go into the aisle; you come
17   back; and the carts are on the floor; and the
18   iPad's in the container, still on.  Right?
19       A    The bins are on the floor.
20       Q    And the iPad is still on?
21       A    Yes.
22       Q    What are you watching?
23       A    Video.
24       Q    Of what?
25       A    I don't recall.

Page 59

1        Q    You have no recollection of what kind
2    of video it was?
3        A    None whatsoever.
4        Q    How do you remember to go back to
5    watching the iPad?
6        A    It was still on.
7        Q    Was the door to the cart open?
8        A    I don't recall.
9        Q    So as you approach the back of the
10   airplane, is there anyone in the aft galley?
11       A    Not at that moment, no.
12       Q    Everyone's taken their seats from the
13   seat belt sign?
14       A    As I recall, yes.
15       Q    Okay.  Then what do you do?
16       A    Watch the video for a -- or -- excuse
17   me -- looked at the video for maybe two -- one or
18   two minutes.
19       Q    That's it?
20       A    Well, I don't know exactly the time,
21   but I know it was extremely short.
22       Q    So as you've come back, you watch the
23   video for one or two minutes?
24       A    Uh-huh.
25       Q    Right?

Page 60

1        A    Uh-huh.
2        Q    Yes?
3        A    Yes.  I'm sorry.
4        Q    And before the seat belt sign went on
5    and you went into the aisle, how long had you
6    watched the video?
7        A    Maybe a total of four, maybe
8    five minutes.
9        Q    So you've only watched this video a
10   total of six or seven minutes on the flight?
11       A    Four to five minutes.  It wasn't that
12   long.
13            I know on the report it did state from,
14   like, 12:25 to 12:45, something of that nature.
15   But in that time, the seat belt sign was on and we
16   were also, actually -- also working in the aisle.
17            So the machine may have been on that
18   time -- for that duration, but we were not sitting
19   there watching it that total time -- that complete
20   time.
21       Q    So after you watched it for a minute or
22   two, what did you do?
23       A    We had a multitude of questions about
24   connections.  We're late.  Everyone had connection
25   questions; just questions.

Page 61

1            And I was working with a Japanese,
2    young lady who didn't understand English, and I
3    didn't understand Japanese; but we were able to
4    ascertain certain things about her trip:  time,
5    departure time, and all that to Japan.
6            And I called Bill and I called the
7    cockpit to get gates for her; plus working with
8    numerous other folks over here (indicating) who, as
9    you're going up, you -- they have questions and
10   questions and questions and questions about
11   connections.
12            That's --  That's every day; that's
13   usual, especially when we're late.  So I was busy
14   with that; Jeannie was busy with it.  People are
15   wanting to know how soon we're going to be there,
16   and are they going to make their connections?
17       Q    So from the time that you watched the
18   video for one or two minutes until you landed, you
19   were working on connection issues?
20       A    Picking up the cabin, getting ready for
21   descent.  Yeah, we were -- we were extremely busy.
22       Q    Did you ever admit to watching the
23   video for 15 minutes?
24       A    No.  I -- I admitted watching the
25   video.

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 62

1    Q    Did you ever hear Ms. Stroup during the
2  investigation say that she had never watched a
3  video before that September 20th flight?
4    A    No.
5    Q    You knew that Ms. Stroup had watched
6  videos before that September 20th flight, correct?
7    A    On occasion.
8    Q    And, in fact, you before September 20th
9  had watched videos with Ms. Stroup, correct?
10    A    Yes.
11    Q    Before the September 20th flight, you
12  and Ms. Stroup had on other occasions watched
13  videos on a personal electronic device, correct?
14    A    Rarely.
15    Q    You had done that, correct?
16    A    Yes.
17    Q    How many times?
18    A    I can't recall.  It was very rare that
19  we were watching it.
20    Q    Was it more than a dozen?  Less than a
21  dozen?  Can you estimate?
22    A    No, I can't.
23    Q    Why can't you estimate?
24    A    It's been a long time.  I mean, on
25  occasion we watched it.

Page 63

1    Q    What kind of things did you watch?
2    A    Videos; we looked at, you know, family
3  pictures, things of that nature.
4    Q    On the iPad?
5    A    Yes.
6    Q    Your iPad?
7    A    Yes.
8    Q    Did she have an iPad?
9    A    No.
10    Q    After the September 20, 2013 flight,
11  did you and Ms. Stroup ever watch a video together
12  again?
13    A    After September 20th; that's what
14  you're stating?
15    Q    Yes.
16    A    No.
17    Q    Did you know anything about Deepesh's
18  reputation at United?
19    A    No.
20    Q    Do you recall other than that one time
21  that he came back to the aft galley -- and you said
22  you had some kind of brief pleasantry exchange with
23  him -- ever having a communication where you spoke
24  to Deepesh?
25    A    Before he came back to the galley; is

Page 64

1  that what you're asking me?
2    Q    At any time during the flight.
3    It sounded to me like you were saying
4  when he came back to the aft galley, you said, Hey,
5  how are you? or something like that --
6    A    Well, as I --
7    Q    -- but that was the only time you
8  talked to him.
9    A    I really don't remember talking --
10  There might have been chitchat when we were -- when
11  I was boarding -- when I was greeting; maybe a
12  little chitchat.  That's about it.
13    Q    When do you believe his behavior became
14  odd?
15    THE DEPONENT:  Excuse me.
16    A    When he seemed -- seemed to be in the
17  galley a little more than normal; meaning that I
18  had told him that since September 11th that
19  passengers are not allowed to loiter in our -- our
20  galleys, for safety reasons.
21    Q    (By Ms. Martinez)  What's your
22  definition of "loiter"?
23    A    Standing there for an inordinate amount
24  of time and just being there.
25    Q    I thought passengers were allowed to be

Page 65

1  in the aft galley.
2    A    When you're there more than you've used
3  the bathroom and you've stretched and everything
4  else -- I mean, they usually get back to their
5  seat.
6    Q    I understand what you're saying, is
7  people usually go back to the seat.  But aren't
8  people allowed to be in the aft galley as
9  passengers?
10    A    Yeah, for a while, of course.  You
11  know, you can stand back there and relax a little
12  bit, you know; but when it goes past 10, 15,
13  20 minutes, whatever, it's -- it's time to go,
14  since 9-11 especially.
15    Q    Is that a rule or just your comfort
16  level?
17    A    No.  I mean, I've talked to other
18  flight attendants; and, basically, that's what they
19  said, was that, you know, Since 9-11, you know,
20  you're not -- for our own safety, not allowed to
21  stay back here just doing nothing.
22    Q    So was Mr. Bagwe there ten minutes or
23  more in the aft galley?
24    A    I -- As for a specific time, I can't
25  give you; but he was there for a long time.

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 74

1      A      (Deponent examined exhibit.)
2            I think if I -- and Jeannie too -- were
3    bad employees, I could understand it.
4            But with Mr. Bagwe being on board, I
5    believe age has something to do with it.  I mean,
6    I'm 41 years; Jeannie's 35.
7            If we were horrible employees, I can
8    understand it.  But with our records, no, no,
9    because if what we had done was so bad, then -- or
10   he had heard that we had watched a video before,
11   why didn't he come to us? why didn't he talk to us?
12           Simply put:  All he would have had to
13   say is, You can't do that.
14      Q      What information and belief are you
15   relying upon, Mr. Lee, when you say that the
16   supervisor was scrutinizing you and Ms. Stroup
17   because of your age?
18      A      That's just base- -- based on a
19   feeling, I mean, it's -- it's based on a feeling.
20   I mean, we are older employees.
21      Q      Anything else?
22      A      Not at the moment.
23      Q      Well, this is my only opportunity to
24   question you --
25      A      I understand.

Page 75

1      Q      -- before the trial, so --  This is a
2    very serious allegation that you're being treated
3    differently because of your age.
4            This is the only opportunity I have to
5    uncover if there is some fact or comment or
6    document or witness who you intend to bring forward
7    to say this shows --
8      A      Well --
9      Q      -- that there was scrutiny because of
10   my age.
11           Is there anything else that would show
12   you were scrutinized, as you've alleged here,
13   because of your age other than your feeling?
14      A      (Deponent examined exhibit.)
15           I would have to go by what I had --
16   have heard through the rumor mill of flight
17   attendants.  Some older people had disappeared.
18           I mean, I had been there a long time.
19   And for me, I feel it was based upon my age; that's
20   totally and sincerely how I feel.
21           As for documentation or -- to back it
22   up, I'm just going with what's in my
23   heart (indicating).
24      Q      Who are the people who disappeared?
25      A      I can't bring names to date (sic), but

Page 76

1    individuals who are no longer there.
2      Q      No longer where?
3      A      Not flying anymore.
4      Q      Based out of where?
5      A      Denver.
6      Q      In what position?
7      A      Flight attendant.
8      Q      Reporting to whom?
9      A      Reporting to whom as to name?
10     Q      Who was their supervisor?
11     A      I have no idea.
12     Q      Do you know whether or not these
13   individuals retired or had anything going on that
14   would have caused them to leave?
15     A      No.  Just -- Just the rumor mill as
16   to, they were fired.
17     Q      Do you have any facts as to why they
18   were actually fired?
19     A      Other than what I've heard, no.
20     Q      And what have you heard?
21     A      Just people disappear; no longer with
22   us.
23     Q      Anything more specific than the rumor
24   mill has it that people have disappeared?
25     A      No.

Page 77

1      Q      Have you, to your knowledge -- Have --
2            Have you or anyone else, to your
3    knowledge, tape-recorded any conversations that
4    relate to your claims in this case?
5      A      No.
6      Q      Do you have any audiotapes of portions
7    or all of the three conferences?
8      A      No.
9      Q      What is the new method of cart setup
10   that you pioneered?
11     A      I was flying Jumbos a lot in -- early
12   in my career.  And the four-star service was bland
13   at that time, and I --
14     Q      Bland?
15     A      Bland; bland; just bland.  It was just
16   napkins and froufrou stuff, you know; nothing
17   really had any color or -- or decoration whatever.
18           And I would tear it up and take bananas
19   and make strawberries flowing into a bin of -- or a
20   pool of, you know, blue water and smoke and
21   everything else.
22           And I always worked for a lady named
23   Sara Hansen.  She just --  She was really senior,
24   and she liked flying with younger flight
25   attendants.  And she always wanted me to work pit.

Page 78

1        So there was a special charter; and
2    they asked me to be part of this charter with execs
3    from Exx- -- Exxon -- excuse me -- and
4    Standard Oil.  There was only 20 of them.  And
5    their ties were, you know, just standard ties.
6    They were -- They were finance guys.
7        And Eddie Carlson put on some Havana
8    cigars, and we had 1921 Pouilly-Fuisse and
9    Chateau Margaux.
10        And I got to go twice out of all the
11    flight attendants that they selected.  And we
12    trained the entire JFK domicile at JFK.  It was
13    awesome.
14    Q    What year, approximately, was that?
15    A    '74/'75.
16    Q    Did that come up during the
17    investigatory process?
18    A    No.
19    Q    Specifically, do you know whether or
20    not that had anything to do with the deliberations
21    that were going on?
22    A    During the investigative process?
23    Q    Yes.
24    A    I don't think it was even considered.
25    Q    Does that allegation --  I was looking

Page 79

1    at Paragraph 29.  Does that allegation have
2    anything to do with whether or not you were let go
3    from United?
4    A    (Deponent examined exhibit.)
5        (Inaudible.)
6        THE REPORTER:  I'm sorry?
7    A    From this one here (indicating), 29?
8    Q    (By Ms. Martinez)  Yes.
9    A    And your question again?
10    Q    Does this allegation have anything to
11    do with whether or not you were let go from United?
12    A    No.
13    Q    Does it have anything to do with
14    whether or not you were subjected to age
15    discrimination?
16    A    Then?  Or now with the hearings; is
17    that what you're saying?
18    Q    At any time.  I heard you say it didn't
19    come up in the hearings.
20    A    It didn't.  No.
21    Q    Please turn to Paragraph 97 of your
22    complaint.  The first two lines read:
23        "United treated Mrs. Stroup and
24    Mr. Lee more harshly than their similarly
25    situated, mostly younger coworkers who

Page 80

1    committed comparably trivial infractions to
2    theirs . . ."
3        Who are these "similarly situated,
4    mostly younger coworkers," if you know?
5    A    By name, no.
6        There's a lot of jump-seat news out
7    there when you're riding -- or working a trip, and
8    especially with different domiciles and stuff.  And
9    people pour their hearts out, especially if they've
10    been what they deem as being wronged or whatever in
11    whatever given situation, whatever grievance they
12    might have had or whatever.
13        But you hear all this stuff, and you
14    pay attention to it.  That's just the rumor mill;
15    that's what's out there.
16    Q    Is "jump-seat news" the rumor mill?
17    A    No.  It's when you're sitting on a jump
18    seat and you're flying with somebody else; you
19    don't know them, but you talk.
20    Q    And you rely on what they say?
21    A    I guess to an extent; but in most
22    cases, there's no reason to doubt them if it's
23    something that happened to that particular
24    individual, no.
25    Q    Have you ever heard anything untrue

Page 81

1    through the jump-seat news?
2    A    Well, of course, there are things that
3    are untrue.  But, you know, one has to ascertain
4    what is to believe, you know, be thought of as
5    being true, or if you've heard it more than one
6    time, or . . .
7    Q    You're not going to ask a court of law
8    to consider jump-seat news or what somebody told
9    you on a plane to be proof, are you, Mr. Lee?
10    A    No.  That's something -- No.
11    Q    What trivial infractions did they
12    commit?
13    A    Oh, my gosh.  The individual in
14    question?
15    Q    If you know.
16    A    I don't know at the moment.
17    Q    You in the next line reference "mostly
18    younger [flight attendants] who committed far more
19    serious rule violations."
20        What is the age of those individuals,
21    "mostly younger"?
22    A    (Deponent examined exhibit.)
23        20s, 30s.
24    Q    Do you have an age cutoff in mind?
25    A    40.

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 82

1    Q    Why is that?
2    A    Well, in most cases when you're
3  considered as being old.
4    Q    Age-protected?
5    A    No. I just -- It -- It could be 54.
6  I'm not sure exactly the -- the number for the age
7  protection; but it was usually younger flight
8  attendants.
9    Q    And when it was "usually younger flight
10  attendants," that means it wasn't always younger
11  flight attendants, correct?
12    A    Correct.
13    Q    So there was some flight attendants
14  over the age of 40 who committed far more serious
15  rule violations than you and Ms. Stroup and were
16  treated less harshly, correct?
17    A    You said "less harshly" or "more
18  harshly"?
19    Q    Less harshly than you.
20    A    There have been some that were treated
21  less harshly than us, yes.
22    Q    Who were also age-protected, correct?
23    A    Younger.
24    Q    Excuse me?
25    A    I would say younger.

Page 83

1    Q    But you write, "mostly younger" flight
2  attendants --
3    A    Uh-huh.
4    Q    -- meaning there are some who are
5  age-protected --
6    A    Uh-huh.
7    Q    -- who were also treated less harshly
8  than you --
9    A    Uh-huh.
10    Q    -- correct?
11    A    You're correct.
12    Q    Do you consider yourself to be a fairly
13  accurate estimator of individuals' age?
14    A    Not a professional; but, yes.
15    Q    Why is that?
16    A    I guess it's just age and trying to pay
17  attention. I don't get it right all the time, but
18  I'm okay.
19    Q    At Page 101 of your complaint --
20  Excuse me.
21        At Page 15, Paragraph 101 of your
22  complaint, five lines down, there's a phrase,
23  quote: where United supervisors exclusively would
24  be positioned on the flights worked by older flight
25  attendants.

Page 84

1        Do you see that?
2    A    (Deponent examined exhibit.)
3        Uh-huh. Yes.
4    Q    Who are the United supervisors you're
5  referring to?
6    A    I can't bring names or remember names.
7        (Deponent examined exhibit.)
8    Q    Who are the older flight attendants
9  you're referring to?
10    A    People our seniority and older.
11    Q    Do you have any names that you're
12  referring to in that allegation?
13    A    No, I do not.
14    Q    How would you know if United
15  supervisors were exclusively positioned on the
16  flights of older flight attendants? Is that
17  jump-seat news?
18    A    No, it is not jump-seat news. It's --
19        THE VIDEOGRAPHER: Careful.
20        THE DEPONENT: Whoops. I'm sorry.
21  Sorry, Jay.
22        THE VIDEOGRAPHER: It's all right.
23        THE DEPONENT: I'm rolling back and
24  forth here. My apologies.
25        THE VIDEOGRAPHER: That's okay.

Page 85

1        THE DEPONENT: Would you repeat the
2  question? Thank you.
3        Sorry, Jay.
4        THE VIDEOGRAPHER: That's okay.
5        THE DEPONENT: Sorry.
6        THE VIDEOGRAPHER: I'm not sure
7  what . . . It was here all night.
8        THE DEPONENT: Can . . .
9        MS. MARTINEZ: Let's re-ask the
10  question. Then we'll take a break.
11        (The following record was read:
12        "Q   How would you know if United
13        supervisors were exclusively
14        positioned on the flights with older
15        flight attendants? Is that jump-seat
16        news?")
17        THE DEPONENT: Thank you.
18    A    It's just when people that I have flown
19  with and -- and have been told that. As to their
20  names, I cannot say; as to their domiciles either.
21    Q    (By Ms. Martinez) So someone told you
22  that they had been working on a flight where United
23  supervisors were exclusively positioned?
24    A    Or they just had a ghost rider.
25    Q    Did you ever ask younger employees

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 90

1    buyout and retire leaves a lot of money left over,
2    basically, for hiring or, you know, taking on
3    others at lower pay.
4        Q     Were you aware of any hiring freezes of
5    Denver flight attendants in the final years of your
6    employment?
7        A     Specifically, datewise, I don't know;
8    but there were some freezes.
9        Q     Do you recall a freeze in 2013?
10       A     No, I do not.
11       Q     Did you ever see an influx of mostly
12   younger flight attendants?
13       A     During what time?
14       Q     At any time.
15       A     Of younger?
16       Q     Yes.
17       A     Yes.  When United would hire, they were
18   very noticeable because they were so young in
19   comparison to the population.
20       Q     Which was what?
21       A     What are you asking?
22       Q     What was the population?
23       A     In Denver?
24       Q     Yes.
25       A     It depends on what year.

Page 91

1        Q     The last few years.
2        A     I would have to say that, again, you
3    notice the new employees because they stood out;
4    they were a lot younger.
5              That's how I can ascertain that too.
6    You know the older group that you see here and now
7    in the domicile.  And then all of a sudden, you
8    have some new blood there; it's, like, wow.
9        Q     How many younger employees were hired
10   as flight attendants in United's Denver location
11   the last few years of your employment?
12       A     I do not know.
13       Q     Can you estimate?
14       A     I cannot.
15       Q     Can you give me an idea of what
16   percentage of the population that was, new hires?
17       A     I cannot.
18       Q     Are you aware of any flight attendants
19   besides Mrs. Stroup and you who supposedly were
20   targeted because of their age?
21       A     No.
22       Q     Who made the decision to terminate
23   your employment -- as you're calling it a
24   "termination" -- at United?
25       A     Dean.

Page 92

1        Q     Dean Whittaker?
2        A     Yes.
3        Q     Okay.  Do you know if anyone else was
4    involved in that decision?
5        A     Mark Dodge possibly; I'm not sure.
6        Q     Why do you say "possibly; I'm not
7    sure"?
8        A     Well, I don't know if they sat down
9    together and talked and had a conference and
10   decided that they're going to fire Ruben.
11       Q     Okay.  Anyone else?
12       A     No.
13       Q     When was the first time you had any
14   interaction with Dean Whittaker?
15       A     The day of the last hearing.  I had
16   never met him before.
17       Q     November 5, 2013?
18       A     I believe.  I'm not sure.
19       Q     Did you know anything about Dean
20   Whittaker before the hearing or conference on
21   November 5th?
22       A     Nothing.
23       Q     Had you heard anything about his
24   reputation --
25       A     No.

Page 93

1        Q     -- at United?
2        A     No.
3        Q     Do you know whether or not he
4    discriminates against individuals over age 40?
5        A     No.
6        Q     Besides that November 5th meeting, did
7    you have any communications with Dean Whittaker?
8        A     No.  That was the first time I had
9    met -- really had met him.
10       Q     So you go into the meeting with
11   Mr. Whittaker on November 5th having no
12   communications whatsoever with him?
13       A     No.
14             THE DEPONENT:  Bless you.
15       A     Actually, I was sitting out waiting for
16   the meeting; and he came up --
17       Q     (By Ms. Martinez)  Okay.
18       A     -- and introduced himself.  That was
19   the first time, Meghan, I'd seen him, yes.
20       Q     Fair enough.  And then you go in and
21   you have the November 5 conference with him,
22   correct?
23       A     Yes, ma'am.
24       Q     Do you have any communications with
25   Mr. Whittaker after the conference ends on

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 98

1    because of strict enforcement of the --
2        A    No.
3        Q    -- rules?
4        A    I feel it's my age -- I'm sorry --
5    because with the allegations that they have against
6    me, a lot of them are very trivial.
7        Q    Were the infractions committed?
8        A    Some.
9        Q    What's your belief as to why you were
10   not discriminated against after you turned 40 at
11   United?  Because how many years did you work
12   between the time you turned 40 and 2013?
13       A    Until when I was forced to retire?  Was
14   it 21 years?
15       Q    So you were age what at the time of
16   your separation?
17       A    61.
18       Q    Why do you believe United did not do
19   anything to impact your employment because of your
20   age if you'd been over age 40 for 21 years?
21       A    I think at age 40 they took more value
22   in their -- their -- their -- their employees.
23   That could be CEO-wise or what the whole general
24   landscape of the company is; but they took a lot
25   better care of us back then.

Page 99

1        Q    Who's "they"?
2        A    The company.
3        Q    Who's "us"?
4        A    Flight attendants and the rest of the
5    employees.
6        Q    Were you a member of the union in 2013?
7        A    Uh-huh.
8        Q    Yes?
9        A    Yes.
10       Q    What union?
11       A    AFA.
12       Q    What rights or privileges does that
13   give you as a flight attendant?
14       A    Well, the collective bargaining
15   agreement; you know, that's all in there.  I mean,
16   that's what we go by.
17       Q    So you had the benefits of the
18   collective bargaining agreement between the AFA and
19   the company as of November 2013, right?
20       A    Yes, ma'am.
21       Q    And one of those benefits is that you
22   had union representation as of September, October,
23   and November 2013, correct?
24       A    Correct.
25       Q    That included Ken Kyle, an AFA

Page 100

1    representative, to guide you through the
2    investigatory process, correct?
3        A    Correct.
4        Q    And that included Mr. Kyle's advice and
5    guidance as to what your options were as of
6    November 2013, correct?
7        A    Some of my options, yes.
8        Q    Is it possible, Mr. Lee, that you could
9    have grieved a termination if you had been
10   terminated?
11           THE DEPONENT:  Excuse me.  Whoops.
12   Sorry.
13       A    Yes, I could have.
14           But the way Ken --  Because I asked him
15   what my options were.  And he said, Well, you could
16   grieve it, like 30 days.  You wouldn't be employed,
17   so you would be making no money whatsoever.  It
18   could be expensive and extremely stressful.
19           And that was the advice that he -- the
20   advice that he gave me at that time.
21       Q    (By Ms. Martinez)  So before you
22   submitted your on-line resignation November 18 --
23   to be effective November 18, 2013, Mr. Kyle did
24   inform you of options to resigning?
25       A    Actually, that wasn't an option.  That

Page 101

1    did --  That would not help me in the least at that
2    point.
3        Q    It was something you could have done,
4    correct?
5        A    Could have.
6        Q    Yes.
7        A    Yes.
8        Q    You had the right to union
9    representation through the grievance process,
10   correct?
11       A    Correct.
12       Q    And that was paid for through your dues
13   with the AFA, correct?
14       A    Yes.
15       Q    If you had been reinstated through a
16   grievance, isn't part of the collective bargaining
17   agreement that you are then made whole, including
18   back pay?
19       A    As I understand it.
20       Q    Are you aware of any employees at
21   United who have been terminated and grieved their
22   termination?
23       A    No.
24       Q    Do you know who the decision-maker
25   would have been if you had grieved a termination?

Page 102

1    A    No.
2    Q    What is the impact of a Letter of
3  Charge, to your understanding?
4    A    It's a severe level next to
5  termination.
6    Q    It's a severe level of what?
7    A    Discipline.
8        THE DEPONENT:  Sorry.
9    Q    (By Ms. Martinez)  Don't you describe a
10  Letter of Charge as not being discipline?
11    A    Oh, excuse me.  I'm sorry.  My --
12  Strike that, please.  I'm sorry.
13        There's certain levels, of course:  a
14  Letter of Charge; and then after Letter of Charge,
15  it could be possible suspension or termination.
16    Q    So what do you understand the levels to
17  be from lowest to highest?
18    A    There's, you know, decision --
19        As to the exact -- Because I'm not --
20  I'd never really been in trouble.  I'm not exactly
21  sure what those levels are other than what I read
22  months ago in the AFA, Your Rights as an Employee.
23    Q    Is it true, though, that a Letter of
24  Charge is not discipline?
25    A    No.  It's a precursor to discipline,

Page 103

1  isn't it?
2    Q    That's my understanding, that --
3    A    Okay.
4    Q    -- that a Letter of Charge is not
5  discipline.  Is that your understanding?
6    A    You just said that it's your
7  understanding that it is -- it is not discipline;
8  it's just the Letter of Charge.  Is that what
9  you're asking me?
10    Q    Yes.  I'll -- I'll restate it
11  precisely:  Is a Letter of Charge discipline?
12    A    I think it is -- it is a letter that's
13  a precursor to what the next step is.  It's
14  indicating that you received a Letter of Charge;
15  you're going to be disciplined for this nature, or
16  you're going to be terminated or suspended.
17    Q    But the Letter of Charge itself is not
18  discipline, correct?
19    A    Not until it progresses further.
20        (Exhibit 23 marked.)
21        THE DEPONENT:  Thank you, Laurie.
22  Thank you.
23    Q    (By Ms. Martinez)  You've been handed
24  what's marked as Exhibit 23.  Do you recognize that
25  document, Mr. Lee?

Page 104

1    A    (Deponent examined exhibit.)
2  Yes.  Yes.
3    Q    Please look at the bottom of Page 7.
4    A    Okay.
5    Q    There's a Subpart (a) --
6    A    Yes.
7    Q    -- that reads:
8        "In 1993, I received a Letter of
9  Charge regarding my attendance due to
10  illness."
11        Do you see that?
12    A    Yes.
13    Q    Then the last sentence on that page
14  reads:  "I was not disciplined."
15    A    Uh-huh.
16    Q    Do you see that?
17    A    Yes.
18    Q    So you understood that a Letter of
19  Charge was not discipline, correct?
20    A    At this moment, yes.  Okay.
21    Q    Let's look at your answer that starts
22  on Page 4.  There's a paragraph that reads:
23        "With regard to the policies that
24  were purportedly in effect at the time of
25  the investigation which United Airlines

Page 105

1  claims I violated" --
2        You then added a parenthetical that you
3  don't admit to violating all of them.
4    A    Uh-huh.
5    Q    I'm going to ask you to take the red
6  pen (indicating), Mr. Lee, and put a check next
7  to --
8        THE DEPONENT:  Thank you, Laurie.
9    Q    (By Ms. Martinez)  -- policies that you
10  do admit to violating.
11    A    That I do admit to violating?
12    Q    Yes, please.
13    A    Thank you.
14        (Deponent examined exhibit.)
15        (Deponent complied.)
16        On the bins, there's nothing --  Where
17  is that located on here?
18    Q    Meaning you should not have had the
19  bins down?
20    A    Meaning I don't see it on here.
21        The one that I . . .  You want to know
22  the ones I put the checks by?
23    Q    I will look at the ones you have checks
24  by.
25        But I just want to make sure we have

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 106

1  a -- anything that you admit to violating checked.
2  And you can actually write "bin," and then just put
3  a check next to it --
4      A    Okay.
5      Q    -- because I don't think it's in there.
6      A    (Deponent examined exhibit.)
7      Okay.
8      MS. MARTINEZ:  May I see it?
9      (Deponent handed exhibit to
10     Ms. Martinez.)
11     Q    (By Ms. Martinez)  And the use of bins
12 is not listed here, correct?
13     A    I'm not seeing it.
14     Q    Okay.  Can you just write "bin."
15     And then I'm also not sure if there's
16 two or three checkmarks.  Is that third
17 one (indicating) checked or not?
18     A    The third one is the full cans of soda.
19 That is checked.
20     (Deponent examined exhibit.)
21     Personally, if the bins aren't on here,
22 I'm not going to write it on.  Okay?
23     Q    Okay.  And -- And you recognize that
24 that is one thing that was a violation during the
25 flight?

Page 107

1      A    (Deponent examined exhibit.)
2      Excuse me.  I'm sorry.
3      (Deponent complied.)
4      So the circle with the X and "Bins" is
5  admitting to.  Okay?
6      Q    Okay.  The name Patricia Careeno, have
7  you heard that before today?
8      A    No.
9      Q    Are you aware of any other individuals
10 who were flight attendants at United and who were
11 under investigation in any way related to use of
12 personal electronic devices?
13     A    No.
14     (Exhibit 24 marked.)
15     THE DEPONENT:  Thank you, Laurie.
16     Q    (By Ms. Martinez)  You've been handed
17 what's marked as Exhibit 24.  Do you recognize this
18 document?
19     A    (Deponent examined exhibit.)
20     2009?  No, I don't recognize it.
21 Sorry.  I don't recognize it; I don't even remember
22 it.
23     Q    Did you receive this document?
24     A    (Deponent examined exhibit.)
25     From my supervisor; is that what you're

Page 108

1  asking?
2      Q    From anyone.
3      A    It's pretty broad.
4      I don't even remember this.  Letter of
5  Warning?  I don't remember this.
6      Q    Do you dispute that you had an
7  Attendance Letter of Warning in 2009?
8      A    I don't recall I had an attendance
9  letter in 2009.
10     Q    Was this letter discussed during the
11 disciplinary process -- excuse me -- during the
12 investigatory prog- -- process?
13     A    I don't know there was even an
14 investigative process.  I -- Again, I don't
15 remember this totally.  I'm sorry.
16     Q    Was this attendance issue and the
17 letter, or as described here, brought up in 2013
18 when you were under investigation for the
19 September 20th flight?
20     A    That, I don't know because this -- this
21 is the first time this has ever surfaced for me.
22     Q    Having reviewed this, do you recall why
23 you had an attendance issue?
24     A    I don't think there's an attendance
25 issue.

Page 109

1      Q    How would you describe it?
2      A    I went on sick list.  I was sick,
3  so . . .
4      That's all I can remember.  I didn't
5  miss a trip or, I mean, do the -- just missing the
6  trip.  I actually was on sick list.
7      (Deponent examined exhibit.)
8      Oh.  I'm not exactly sure or exactly
9  correct, but I think I had prostate cancer about
10 this time (indicating).
11     Q    You're not sure if -- if that had
12 anything to do with that letter?
13     A    I'm -- I'm not sure, again.
14     Meghan, I'm -- excuse me -- I'm
15 trying -- trying to remember because I see Steve
16 Zitnak (indicating); and he wasn't always my
17 supervisor.
18     (Deponent examined exhibit.)
19     And I believe this is when I had
20 prostate cancer.
21     Q    And did you miss work?
22     A    I was on sick list for, like, a month.
23     Q    Okay.  Were you ever disciplined as a
24 result of this?
25     A    Other than just -- not specifically;

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 114

1    that just messed up, not professional.  They needed
2    somebody they could trust, and they selected me.
3        Q     How old were you?
4        A     30s.
5              In other words, they wanted somebody
6    they could depend on that wouldn't goof up and do
7    the right thing.
8        Q     What year was this?
9        A     Between the '80s and '90s.  It was
10   two -- two Super Bowls.  Haven Moses.  Yes, yes.
11   It was two Super Bowls.
12       Q     What is the Domicile Achiever Award?
13       A     I flew purser on Jumbos a lot:  DC-10s,
14   747s.  I was acknowledged for that, for my work.
15       Q     When was this?
16       A     I want to say '80, '85, somewhere in
17   that area.
18       Q     Did you bring this up when you were at
19   the hearing?
20       A     No.  They knew of it.
21       Q     How do you know that?
22       A     They had my records, just as they're
23   here today.
24       Q     Do you know whether anyone read the
25   full extent of your personnel record?

Page 115

1        A     Honestly, I don't know because Dean
2    didn't know me.
3        Q     Do you know whether or not United is
4    supposed to take into account awards you've won in
5    deciding whether or not to issue discipline?
6        A     I can't say "supposed to take into
7    account," Ms. Martinez.
8              But 41 years, yeah; I would think that
9    would be a consideration, yes, definitely.
10       Q     I hear your testimony that you would
11   think it was a consideration.
12             But my question is:  Are you aware of
13   any rule or requirement that United consider the
14   length of employment if someone has violated the
15   rules?
16       A     No, I do not know of a rule.
17       Q     In 1984 you were selected for special
18   assignment as supervisor of Inflight Crew
19   Resources; is that true?
20       A     Yes.
21       Q     What allowed you to be selected for
22   that?
23       A     They wanted somebody who was highly
24   visible.  I did a lot of special assignments; I was
25   asked to do a lot of special -- special

Page 116

1    assignments.
2              They wanted a flight attendant's view
3    on the scheduling side of things because the
4    schedule seemed to be -- (Inaudible.)
5              THE REPORTER:  The schedule seemed to
6    be . . .
7        A     The schedule seemed to be a little
8    callus as to being able to connect with the flight
9    attendants.  So they thought if we had a flight
10   attendant on that side, it would help; and it did.
11       Q     (By Ms. Martinez)  Is it true that you
12   did not file a complaint of age discrimination
13   while you were employed at United?
14       A     Repeat that, Meghan, please.
15       Q     Is it true that you did not file a
16   claim of age discrimination while you were employed
17   at United?
18       A     That is true.
19       Q     Is it true that you did not complain of
20   age discrimination while you were employed at
21   United?
22       A     That is true.
23       Q     Why didn't you?
24       A     I wasn't being mistreated.
25       Q     Do you believe that Ken Kyle

Page 117

1    discriminated against you based on your age?
2        A     My union rep?  No.
3        Q     Why not?
4        A     I just don't.
5        Q     Is there a particular age that you
6    believe United was targeting for trying to get rid
7    of their flight attendants at?
8        A     Just older, Ms. Martinez.
9        Q     Anyone age 40 and over, or was it 50
10   and over or 60 and over?
11       A     That's a good question.
12             When you're out there in the ranks and
13   you see who you're flying with -- because this is
14   what you can hold -- okay? -- and I was senior; you
15   held good trips; you earned good trips -- those
16   people were 50 and -- and -- and older.
17       Q     Is there a particular age that you
18   believe United was trying to get rid of their
19   flight attendants at?
20       A     No.
21       Q     How were you assigned supervisors?
22       A     Back in the day, they used to do it
23   with your last name, your initial.
24       Q     Which supervisors do you recall having
25   and when?

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 154

1     A    I had taken it out of my pocket in
2   preparation to put it in my bag.  The seat belt
3   sign came on.  I ushered Mr. Bagwe forward because
4   he was hanging around.
5        And as we were going by the bathroom, I
6   was setting it on the counter in my right hand.
7   And he leans back (indicating) -- because he didn't
8   know what was in my hand -- to take a look.  And I
9   asked you (sic), May I help you?
10        So he never saw anything in my hand.
11   He just thought there was something there.  I was
12   not smoking it blatantly or anything like that.
13        I took it out of my pocket, was getting
14   ready to put it in my bag; the seat belt sign came
15   on; laid it on the counter next to some debris,
16   whatever was there.
17     Q    Why didn't you just take it out of your
18   pocket and put it in your bag?
19     A    Because the seat belt sign came on.  I
20   had to go check seat belts.
21     Q    Why couldn't you put it in the bag and
22   then go check seat belts?
23     A    My bag was in my storage area.
24     Q    Why didn't you leave it in your pocket?
25     A    Because it was in my hand.  Seat belt

Page 155

1   sign came on.  I walked up, put it on the
2   counter (indicating), and I walked forward.
3     Q    But why didn't you just put it back in
4   your pocket?
5     A    There was no time.  I had to check seat
6   belts.
7     Q    But you pulled it out of your pocket;
8   then the seat belt sign came on?
9     A    No.  I pulled it out of my pocket
10   before the seat belt sign came on in preparation of
11   putting it back in my bag.
12        When the seat belt sign comes on, you
13   have to check seat belts; so there's no time to put
14   it in my bag.  So I laid it on the counter out of
15   the way of -- out of the view of everyone else, and
16   I went forward and did my -- my -- my seat belt
17   check.
18     Q    So it was in your hand for how long
19   before it was on the counter?
20     A    30 seconds.
21     Q    And then it was on the counter for how
22   long?
23     A    After I came back from checking my seat
24   belts.
25     Q    Do you agree that if you had been

Page 156

1   smoking an electronic signa- -- cigarette on the
2   September 20th flight that you would have been
3   violating United policies?
4     A    Oh, absolutely.  I knew it was a no-no.
5   And I didn't smoke an electronic cigarette that day
6   or any other day.
7     Q    Would you agree that you would also be
8   violating Federal law if you were smoking an
9   electronic cigarette?
10     A    Oh, absolutely.
11        THE VIDEOGRAPHER:  Will you move over.
12        THE DEPONENT:  Oh, sorry.
13        (Exhibit 27 marked.)
14        THE DEPONENT:  Thank you, Laurie.
15     Q    (By Ms. Martinez)  I've handed you a
16   one-page document marked Exhibit 27.  This is a
17   paragraph Deepesh submitted about your smoking in
18   the aft galley.  Midway down, he says that at 12:25
19   you were "smoking a cigarette in the aft galley."
20        Is that -- Excuse me.  Is that true or
21   not?
22     A    That is absolutely not true.
23     Q    Okay.  And he says:
24        "It did not create a lot of smoke as
25   it was an electronic" signature --

Page 157

1   "cigarette."  Excuse me.  "Ruben smoked for
2   [a] very brief moments . . ."
3        Is it true that you smoked for very
4   brief moments?
5     A    No.
6     Q    Is it true that you left the cigarette
7   on the galley counter?
8     A    Yes, it is.
9     Q    Is it --
10     A    Can I -- May I say -- I'm sorry.
11        This says it's dated September 21st.
12   The first e-mail that went to Mark Dodge was on the
13   20th; so this was an afterthought.
14     Q    Well, that may be your characterization
15   of it, Mr. Lee; but that's not the question that's
16   pending.
17     A    Okay.
18     Q    There is a statement here that you were
19   "boldly smoking in front of the customers" waiting
20   for the restroom breaks.  Is that true?
21     A    That is very untrue.
22     Q    Okay.  So is it your testimony that
23   anything that is added to an initial statement is
24   an afterthought?
25     A    No, no, no, no, no.

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 166

1    that is not correct. I have watched movies before,
2    rarely.
3              But, again, that's what came to mind.
4         Q    Are you familiar with the concept of
5    unannounced excellence reviews?
6         A    Yes, I am.
7         Q    When did you first become aware of
8    those?
9         A    Well, the -- On the line, they're
10   called "ghost rides." Okay? And I've had many of
11   them, like all of us have.
12             But they told you what you did right,
13   first of all; and if you might have done something
14   not up to par, they told you then as well.
15        Q    Is there any requirement that you're
16   aware of, Mr. Lee, that United immediately inform
17   you on an unannounced excellence review of what
18   you've done wrong?
19        A    I think it's courtesy of anything, you
20   know, as an employee, you know, and for the
21   situation.
22        Q    Is there anything that requires United
23   to tell you if you've done something wrong on that
24   actual flight?
25        A    No; but not if you value your

Page 167

1    employees, no.
2         Q    Do you think that reviewing flight
3    attendants in the air is a good idea?
4         A    Oh, absolutely. I mean, it -- it --
5    For the company, it gives them an idea of what's
6    going on in the air. And for the flight attendant,
7    it gives them the dos and don'ts.
8         Q    Do you understand that United may want
9    to review its flight attendants while they are on
10   flights and not tell them they're being reviewed?
11        A    Please restate the -- the question.
12        Q    Do you understand that United may want
13   to review its flight attendants while they are in
14   the air and not tell them they are being reviewed?
15        A    If you're a problem flight attendant,
16   yes. One with my record and Jeannie's record, no.
17        Q    What about a flight attendant who's had
18   a complaint come in about him or her?
19        A    Such as, i.e., the individual coming to
20   Mark; is that what you're stating?
21        Q    Well, you described exceptions in your
22   rule as people who are problem flight attendants.
23   Could that be someone who's had a complaint come in
24   against them?
25        A    That could be someone that a complaint

Page 168

1    has come in about them, yes.
2         Q    When is the first time that you became
3    aware of any concerns with your job performance on
4    the September 20th flight?
5         A    Oh, as soon as Mr. Mark called me; I
6    think it was 9-25.
7         Q    Sorry. But I need to go back to 28.
8    I'm not sure I can read all your writing.
9              Can you just read from 12:50 down for
10   me, please, for the record.
11        A    12:50. (Inaudible.)
12             THE REPORTER: I'm sorry?
13        A    Called Bill and told him that the lavs
14   were inop. Placed a sign -- We placed a sign
15   saying it was out of order. Once landing, captain
16   said that there was no water in the tanks.
17             More?
18        Q    (By Ms. Martinez) Yes. It looks like
19   there's a question asked of you. Is that a Q)?
20        A    When did we indicate that the
21   lavatories were broke, I guess is what they're
22   saying. When the lady came out of it.
23             Then it says, I -- We had little ground
24   time, rushed on, did our safety checks, and
25   boarded.

Page 169

1         Q    So you wrote, A lady -- What does this
2    say? First lady to --
3         A    When a lady came out of it.
4              But after thinking about it, it was
5    actually Jeannie that came out of it.
6         Q    So you said that Mr. Dodge contacted
7    you, and that was the first you heard about your
8    job performance on the September 20th flight,
9    right?
10        A    In a voice mail, yes.
11        Q    What did the voice mail say?
12        A    From what I can recall, that we had
13   some adverse report from the unannounced excellent
14   review on you and that he was removing me from my
15   next trip.
16        Q    Did you save that voice mail?
17        A    I had it for a while; but then I got a
18   new phone, and I don't have it anymore.
19        Q    What did you do next?
20        A    After I got off the floor?
21             Tried to think of every reason --
22   whatever reason there was why I was being called
23   in.
24        Q    Did it occur to you that watching a
25   video and having somebody come up behind and take a

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 170

1    photo of you might have been that flight?
2        A    No, it never even entered my mind.
3            I mean, when I say "everyone," like
4    90 percent of the domicile and across the nation
5    were all on their electronic equipment:  jump seat,
6    passenger seat, whatever.
7            So -- I'm sorry -- I did not know at
8    that time that it wasn't allowed because everyone
9    was on it.
10       Q    So what other older flight attendants
11   were terminated pretextually for watching their
12   personal electronic devices?
13       A    I have no idea.
14       Q    What did you do next to find out what
15   the process should be?
16       A    Pertaining to . . .
17       Q    You said that you got a call from
18   Mr. Dodge --
19       A    Oh, okay.
20       Q     -- and he left a voice mail.  What
21   happened next?
22       A    I don't know.  I -- I can't remember
23   if I called the union or what.
24            I might have called Jeannie to see if
25   she received the same thing and just told her about

Page 171

1    what was happening to me.  But I'm not totally for
2    sure what I did because shock was definitely there.
3        Q    Did you call any other flight
4    attendants besides Ms. Stroup?
5        A    No.
6        Q    Why not?
7        A    Because I was flying with Jeannie.
8        Q    Do you recall having a conversation
9    with her?
10       A    As to detail, no.  I know I probably
11   spoke to her, yes.
12       Q    Okay.  What do you recall happening
13   next in the process?
14       A    The first hearing.
15       Q    Was there a September 27th meeting?
16       A    I believe that was the first one.
17       Q    Okay.  And that's the one where you
18   wrote this statement, the Exhibit 28 we looked at,
19   correct?
20       A    That was the very first hearing; yes,
21   that would have been it.
22       Q    Who was present in that?
23       A    Oh, wow.  Definitely Mark, Ken Kyle,
24   someone taking notes, and someone else from
25   Inflight.

Page 172

1        Q    How long was that meeting?
2        A    I have no clue.
3        Q    Did you take any notes?
4        A    Well, obviously, these right
5    here (indicating).
6        Q    Well, that's --  Are those notes, or is
7    that a statement?
8        A    Oh, we took the notes that --
9            Well, this (indicating) is -- this is
10   just what was given to me to write down.  And they
11   requested that I write down the question and then
12   write down my answer.
13       Q    Okay.  Did anyone else besides those
14   individuals come in and out of the September 27th
15   meeting?
16       A    Ms. Martinez, I don't -- I don't
17   recall.
18       Q    Okay.  Where was it?
19       A    In-- --  Inflight.
20       Q    How did the meeting open?
21       A    For that answer, I have to think about
22   this one.
23            Ken Kyle and I walked in.  And Mark
24   was, I believe, standing.  And I don't know if he
25   gave me the excellence review first or what.  But I

Page 173

1    think I remember him saying that I needed to sign
2    something confidentiality or something like that
3    that I don't remember signing.
4            And . . .  And then everything just
5    started, just become a blur.
6        Q    Do you remember anything else about
7    that meeting than what you've testified to?
8        A    Ms. Martinez, I -- you know, I was in
9    such shock that I don't remember much.  It just all
10   seemed so much like a blur.
11           And I just remember writing all this
12   stuff and trying to -- just trying to focus on
13   everything 'cause it just seemed so surreal.
14           And that's basically what I remember of
15   the first one.
16       Q    How did the meeting end?
17       A    I think something was mentioned about a
18   follow-up hearing.  I don't recall totally.
19           But I just remember leaving the room
20   and Ken saying something to me; as to the content,
21   I don't recall.
22       Q    Okay.  What is the next thing you can
23   remember happening in the investigatory process
24   after the September 27th meeting?
25       A    Hearing two, I think.  It was either

Page 178

1  up a rebuttal or whatever he wanted to read at the
2  end of the last meeting.
3      Q    And then you met on November 5th?
4      A    I believe that's the date.
5      Q    Who was in that meeting?
6      A    That was the third meeting.  It would
7  be Ken Kyle, Mark, Dean.
8      Q    So there were four of you total?
9      A    Well, I think so, Ms. Martinez.  I'm --
10  I think so.
11      Q    Did you audiotape any of that meeting?
12      A    No, ma'am.
13      Q    Where was it?
14      A    Same place as the last one -- the last
15  two, in Inflight.
16      Q    Did you take anything with you into the
17  meeting?
18      A    I think what I remember was the
19  rebuttal I had -- I had written up for Dean and
20  Mark, indicating that, you know, I was aware of
21  whatever actions and would stop doing whatever in
22  the future; something about my -- my -- my work
23  history, something along those lines.
24          I don't know exactly -- I don't
25  remember exactly what I had in that letter, but I

Page 179

1  did read it at the end of the hearing.
2      Q    So you brought in a statement that you
3  read to the three others during the November 5th
4  meeting?
5      A    Yes.
6      Q    Did you bring anything else with you
7  into the meeting?
8      A    No, not anything that I can recall.
9      Q    Did you take anything out of the
10  meeting?
11      A    I don't recall.
12      Q    How did that meeting start?
13      A    With Mark, I believe; and then it ended
14  with Dean.
15      Q    Was that November 5th meeting called
16  anything?
17      A    I don't recall.
18      Q    What do you recall happening in the
19  November 5th meeting?
20      A    Mark talking.  I remember a comment
21  that Dean said at the end.  And that was about it.
22      Q    What did Mark say?
23      A    Dean?
24      Q    You said, I remember Mark talking.
25      A    I remember Mark talking.

Page 180

1          I just remember --  Well, he had to
2  talk.  I mean, he was running the meeting, so -- I
3  don't --  As to the actual word for word or
4  verbatim or whatever, I don't -- I don't know; I
5  don't recall.
6          And then Dean took over.
7      Q    What did Dean say?
8      A    Without even knowing me, he said:  At
9  the end of the day, Ruben, I just have a picture --
10  a vision of you looking at your iPad and our
11  passengers are suffering.
12      Q    Did he say anything else?
13      A    No.
14      Q    Did you say anything in response?
15      A    No.
16      Q    Did Ken Kyle say anything in that
17  meeting?
18      A    No one said anything.
19      Q    Did Ken Kyle say anything on your
20  behalf in the November 5th meeting?
21      A    Something about my record, I think, and
22  my years of service.  I believe that's about it.
23      Q    Other than to read the statement, did
24  you say anything during the November 5th meeting?
25      A    No.  It was my turn, I believe, to

Page 181

1  talk.  I mean, that's, you know, the conclusion.  I
2  mean . . . (Inaudible.)
3          THE REPORTER:  Pardon me?
4      A    It was my turn to -- to talk.
5          I mean, Do you have anything to say?  I
6  believe that was what's -- what was said:  Do you
7  have anything to say or to add?
8          And that's when I read my
9  letter (indicating).
10      Q    (By Ms. Martinez)  What is Ken Kyle's
11  position at United?
12      A    He is an AFA rep, flight attendant rep.
13      Q    He's the union representative?
14      A    Uh-huh.  One of the --  One of them.
15      Q    Does he have authority over whether or
16  not flight attendants such as yourself are fired?
17      A    No.
18      Q    When is the last day for which you
19  received pay at United?
20      A    I don't remember the exact day,
21  Ms. Martinez, but I do --  To try to remember that,
22  it was -- had something to do with vacation pay.
23      Q    Okay.  After you left that November 5th
24  meeting, what was your understanding of the
25  process?

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 182

1     A     That we had to wait a certain amount of
2  time -- (inaudible) -- a certain amount of time --
3         THE DEPONENT:  Excuse me.
4     A     -- a certain amount of time for Dean to
5  render his result.
6     Q     (By Ms. Martinez)  Have you heard of
7  the phrase "Letter of Decision"?
8     A     Kind of, yes.
9     Q     Do you know what a Letter of Decision
10 is?
11    A     Offhand, no, ma'am.
12    Q     Okay.  So when you're referring to
13 needing to wait time for Dean to render his
14 result --
15    A     His dec- -- decision.
16    Q     A decision about what?
17    A     My job.
18    Q     Meaning, a decision about what to do
19 with your employment?
20    A     A decision what he is going to do with
21 us, period.
22    Q     Okay.  And what were the different
23 things that he could have decided at that point?
24    A     Suspension, termination.
25    Q     Were there any other options to him

Page 183

1  besides suspension or termination?
2     A     I don't know what Dean's options were,
3  ma'am.
4     Q     Did you ever ask Mr. Kyle what the
5  different types of decisions Mr. Whittaker may
6  render after November 5th could be?
7     A     I had either texted or e-mailed him --
8  I believe it was text him -- a few times as to, had
9  he heard anything yet, or he had some questions and
10 stuff like that.
11        But there wasn't really a lot of
12 communication between he and I other than those
13 texts and the phone call on the 15th.
14    Q     So thinking back on those
15 communications, did you and Mr. Kyle ever discuss
16 what were the different things that Mr. Whittaker
17 could do after November 5, 2013?
18    A     Possible suspension; doubt termination,
19 with your record.
20        That's basically what I remember other
21 than the conversation on the 15th.
22    Q     What do you recall about the
23 conversation on the 15th?
24    A     Wow.  It know it was the last day, the
25 15th -- after 15 days, whatever; but it was a

Page 184

1  Friday night after 6 o'clock, after business hours.
2         And I was in my garage, and I got a
3  phone call from Ken.
4     Q     Who said what?
5     A     "Dean has decided to terminate you."
6     Q     Is that how he opened the call?
7     A     Pretty much.
8     Q     Did you ask him, What are my options?
9     A     Yes.  And he said something about:  You
10 can appeal it.  It would be expensive; it would be
11 stressful; it could take a long time.
12    Q     Did you say anything else during that
13 call with Mr. Kyle?
14    A     Thinking back, I -- I -- I was in such
15 shock and just disbelief.  I had to tell my family;
16 you know, I knew I had to tell my wife and . . . I
17 knew that wasn't going to go over well.
18        I just couldn't believe it.
19    Q     Do you recall anything else that was
20 said during that call with Mr. Kyle?
21    A     I don't recall at this time, no.
22        (Exhibit 29 marked.)
23        THE DEPONENT:  Can we take a break?
24        MS. MARTINEZ:  Let me ask you a couple
25 of follow-up questions.

Page 185

1     Q     (By Ms. Martinez)  What was the quote
2  that Mr. Kyle said to you?  Was it Dean "has
3  decided" or "will decide"?  What exactly did he
4  say --
5     A     What I recall is --
6     Q     -- Dean had done?
7     A     I'm sorry for interrupting.
8         He said, "Dean decided to terminate
9  you."  Okay.  He also added, But I talked to him
10 and asked him, could you resign?
11        And I think that's when the -- the part
12 about appeals came up, about being expensive, long,
13 and stressful.
14        And I just remember it -- remembering
15 that if you do it by the 18th and -- then the
16 termination letter wouldn't go out on the 19th.
17 I'm sitting here thinking, I have one day to do
18 what it takes most flight attendants six months to
19 do.
20    Q     Was his quote, Dean has terminated you,
21 or Dean will --
22    A     "Dean decided to terminate you."
23    Q     So you knew when you hung up the phone
24 with Mr. Kyle that you had not been terminated,
25 correct?

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 186

1    A    At that point, yes, unless we retired
2 by the 18th.
3    Q    Did United ever terminate you?
4    A    In writing?
5    Q    In writing.
6    A    Other than the separation report that
7 we received from Maive Moran days later.
8    Q    Did United ever terminate you?
9    A    Yes.
10    Q    Did you submit your resignation before
11 the termination?
12    A    I had no choice.  I was either to
13 resign or be terminated.  The termination letter
14 would go out that next day.
15    Q    I'm asking about the timing.  Didn't
16 you submit your resignation before United
17 terminated your employment?
18    A    Once again, the termination had --  If
19 I did not resign by Monday the 18th, the
20 termination letter was going out on the 19th.
21    Q    It's a yes-or-no question:  Did you
22 resign before the termination became effective?
23    A    Yes.
24       MS. MARTINEZ:  Let's take a break.
25       THE VIDEOGRAPHER:  The time is 1:52.

Page 187

1 We're going off the record.
2       (Recess from 1:52 p.m. to 2:05 p.m.)
3       THE VIDEOGRAPHER:  The time is 2:05.
4 We're back on the record.
5    Q    (By Ms. Martinez)  Mr. Lee, do you
6 understand that you are still under oath?
7    A    Yes.
8       THE DEPONENT:  Excuse me.
9    Q    (By Ms. Martinez)  You've been handed
10 what's marked as Exhibit 29 for identification.  Do
11 you recognize that document?
12    A    (Deponent examined exhibit.)
13       Yes, I do.
14    Q    What is it?
15    A    It's a Performance Letter of Charge.
16    Q    Did you receive that the first week of
17 October 2013?
18    A    I think it was dated on the 4th; yes,
19 on the 4th.
20    Q    Do you admit that you committed some of
21 the disciplinary infractions that are listed in
22 this Letter of Charge?
23    A    (Deponent examined exhibit.)
24       Some of them, yes.
25    Q    Is there anything at United that

Page 188

1 qualifies infractions as minor or major?
2    A    I think that would be up to the -- what
3 type of infraction it is.  I mean, a minor
4 infraction would be simply something like not
5 wearing your apron.
6    Q    But is there anything at United --
7    A    No.
8    Q    Let me finish my question, please.
9    A    I'm sorry.
10    Q    Is there anything at United that you
11 are aware of that qualifies infractions between
12 major and minor?
13    A    Not that I know of.
14    Q    Is there anything at United that you're
15 aware of that qualifies infractions as trivial or
16 nontrivial?
17    A    Not that I know of.
18    Q    Were you aware that Ms. Stroup was --
19       THE VIDEOGRAPHER:  Sorry.  I'm sorry.
20    Q    (By Ms. Martinez)  -- e-mailing
21 Mr. Whittaker in November?
22    A    November.  After . . .
23    Q    In between the time that you had your
24 November 5th meeting and the time you submitted
25 your on-line resignation form --

Page 189

1    A    Uh-huh.
2    Q    -- were you aware that Ms. Stroup was
3 e-mailing Mr. Whittaker?
4    A    No.
5    Q    Did you and Ms. Stroup talk in between
6 the November 5th meeting and when you submitted
7 your on-line resignation?
8    A    I don't recall.
9       (Exhibit 30 marked.)
10       THE DEPONENT:  Thank you, Laurie.
11    Q    (By Ms. Martinez)  Do you recognize
12 what's been handed to you as Exhibit 30?
13    A    (Deponent examined exhibit.)
14       Yes.
15    Q    You've seen that form before?
16    A    On the 18th.
17    Q    Did you fill out that form?
18    A    Yes.
19    Q    Did you fill out the date "11/18/13"
20 that's the third line under Retirement Request
21 Form?
22    A    (Deponent examined exhibit.)
23       Yes.
24    Q    Did you complete this Retirement
25 Request Form at approximately 1:03 p.m. on Monday,

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 202

```
 1      Q    (By Ms. Martinez)  Did you say "Federal
 2   Express"?
 3      A    I think Express -- Express Jets.
 4           And I don't recall if I -- if I sent in
 5   an application for Fed Ex; I don't recall.
 6      Q    Did you and Ms. Stroup coordinate any
 7   of your job searches?
 8      A    I -- I think the only one might have
 9   been Frontier 'cause my sister said they were
10   having an open house.  And I think that's the only
11   one.
12      Q    Did you coordinate with Ms. Stroup to
13   apply for any of the same employers?
14      A    No.  I think I told her about the open
15   house.
16      Q    Please look at . . .
17           (Exhibit 34 marked.)
18      Q    (By Ms. Martinez)  -- Exhibit 34.  What
19   is Exhibit 34?
20      A    (Deponent examined exhibit.)
21           "Ruben, PLEASE" . . . (Inaudible.)
22           This is an e-mail to Dean on the 18th
23   confirming my notice -- no -- excuse me --
24   notification of retirement.
25      Q    Is the bottom e-mail an e-mail that you
```

Page 203

```
 1   sent to Dean Whittaker?
 2      A    Yes, it is.
 3      Q    So I notice it's signed by you at the
 4   bottom, but it's from Betti Lee.
 5      A    That's my sister.  We own her computer.
 6      Q    Okay.  So on November 21st, you
 7   e-mailed Dean Whittaker regarding the fact that you
 8   had submitted your retirement effective
 9   November 18, correct?
10      A    That is correct.
11      Q    By the way, did you ever receive a
12   letter from United, including from Mr. Whittaker,
13   terminating you on November 19th?
14      A    No.  That's why I'm asking for
15   something in -- in writing on those previous ones.
16           I was informed by my union rep, Ken
17   Kyle, that he had spoken to Dean and had talked
18   about that he needs to retire by Monday or that
19   termination letter would definitely be sent out on
20   Tuesday, the 19th.
21      Q    Did you ever get such a termination
22   letter?
23      A    No.  No, I didn't receive any
24   termination letter because, supposedly, had I
25   retired first, that termination letter would not go
```

Page 204

```
 1   out.
 2      Q    I just want to know if you've ever seen
 3   anything that looks like this letter that you were
 4   afraid would be sent out.
 5      A    No.
 6           (Exhibit 35 marked.)
 7           THE DEPONENT:  Thank you, Laurie.
 8      Q    (By Ms. Martinez)  I've handed you
 9   what's marked as Exhibit 35.  Have you seen the
10   grievance procedures set forth in Exhibit 35 before
11   today?
12      A    (Deponent examined exhibit.)
13           Yes, I have.
14      Q    When did you first see these?
15      A    I believe it's some info that Ken had
16   given me, your rights as an employee, AFA.
17      Q    Did he give those to you before the
18   November 5th meeting?
19      A    (Deponent examined exhibit.)
20           I don't recall.
21      Q    Did he give this to you before you
22   submitted your resignation on November 18th?
23      A    Yes, I believe so.
24      Q    Is it true, Mr. Lee, that when you
25   submitted your on-line resignation or retirement,
```

Page 205

```
 1   whatever you want to call it -- when you submitted
 2   the November 18th form -- you were in between
 3   Subparagraphs A.2. and A.3. in the grievance
 4   process?
 5      A    (Deponent examined exhibit.)
 6           Under 3:
 7           Manager of Inflight Services or
 8   designee shall, within fifteen . . . days
 9   after the close -- close of such hearing,
10   issue a decision in writing -- in writing
11   to the Flight Attendant and, unless
12   otherwise requested by him -- her or him --
13   excuse me -- to the LEC President . . .
14   Grievance Chairperson, MEC President . . .
15   Grievance Chairman and Legal Department of
16   the Union.
17      Q    Do you need me to repeat the question?
18      A    Please.
19      Q    Is it true that when you filled out the
20   form to have your retirement be effective
21   November 18, 2013, you were in between
22   Subparts A.2. and A.3. in the grievance procedures?
23      A    That is correct.
24      Q    You had not received a decision in
25   writing from the manager, Inflight Services, as of
```

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d

Page 206

1    the time you submitted your resignation, correct?
2       A    Correct.
3            (Exhibit 36 marked.)
4            THE DEPONENT:  Thank you, Laurie.
5       Q    (By Ms. Martinez)  You've been handed
6    what's marked as Exhibit 36.  Do you recognize that
7    document, sir?
8       A    (Deponent examined exhibit.)
9            Yes, ma'am.
10      Q    What is it?
11      A    This is the 2000 collective agreement
12   between United Air Lines and flight attendants.
13      Q    And was that in effect when you
14   separated from United?
15      A    Yes.
16      Q    Your complaint references that you had
17   a prestigious assignment of modeling new uniforms.
18   When was that?
19      A    Wow.  Excuse me.  In the '70s, I was
20   asked to model one of three uniforms for
21   United Air Lines for the flight attendants.  It was
22   a Stan Herman design.
23           They used a courier to bring me my
24   uniforms so no one could see it.  And I was flown
25   to Chicago to model it, along with other flight

Page 207

1    attendants -- out of Denver was Kathy Boytana -- in
2    front of Dick Ferris and the board of directors.
3       Q    When was that?
4       A    I would say '74.  I was still in
5    New York; I was still flying out of New York.
6       Q    Does that assignment have anything to
7    do with whether or not you were separated from
8    United?
9       A    No.
10      Q    You were also a drummer in the
11   Magnificent 7000 Roadshow?
12      A    Uh-huh.
13      Q    Is that correct?
14      A    Uh-huh.
15      Q    Yes?
16      A    Yes.  I'm sorry.  Sorry.
17      Q    And when was that?
18      A    '74 -- '73/'74.
19      Q    Did your position as a drummer in the
20   Magnificent 7000 Roadshow have anything to do with
21   whether or not you're still employed at United?
22      A    No, ma'am.
23      Q    Did the position of drummer in the
24   Magnificent 7000 Roadshow come up during the
25   investigatory process?

Page 208

1       A    No.
2       Q    Did the fact that you'd received the
3    assignment for modeling new uniforms come up during
4    the investigatory process?
5       A    No.
6       Q    The Paragraph 27 in your complaint
7    refers to an emergency landing in 1974.
8       A    Uh-huh.
9       Q    You were in an emergency landing as a
10   flight attendant in 1974?
11      A    Uh-huh.
12      Q    Yes?
13      A    Yes, ma'am.
14      Q    Okay.  And did that come up in the
15   investigatory process in 2013?
16      A    No.
17      Q    Does that have anything to do with
18   whether or not you're still employed at United?
19      A    Whether or not that came up in the
20   investigative . . .
21      Q    I'm sorry.  Does that emergency landing
22   have anything to do with whether or not you're
23   still working for United?
24      A    No.
25      Q    Please look at what's Exhibit 18 in

Page 209

1    front of you.
2       A    (Deponent examined exhibits.)
3            Whoops.  I'm sorry.  I'm not seeing 18.
4       Q    I can hand you an extra copy.
5       A    Thank you.
6       Q    Sure.  Do you recognize --
7            And I'm only showing you Page 3 of
8    Exhibit 18 --
9       A    Okay.
10      Q    -- but do you recognize that letter?
11      A    (Deponent examined exhibit.)
12           Yes, ma'am.
13      Q    Did you receive that letter in
14   approximately the third week of November 2013?
15      A    Man, I'm really . . .
16           (Deponent examined exhibit.)
17           I'm really -- I really want to say
18   yes; I would like to say yes.
19      Q    Do you not remember whether you
20   received it?
21      A    Oh, I -- I received it; but as to exact
22   day or time, I don't recall.
23      Q    Was it within a month or so?
24      A    Of retirement?
25      Q    Yes.

31f2fa3d-12ee-4eb6-8b14-7b39f042ac6d