# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:  15-cv-03189-WYD-CBS

JEANNE STROUP; and
RUBEN LEE,

      Plaintiffs,

v.

UNITED AIRLINES, INC.,

      Defendant.

_____

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

_____

      Plaintiffs Jeanne Stroup and Ruben Lee, through undersigned counsel, submit the following Response to Defendant's Motion For Summary Judgment [Doc. 67, filed 11/17/16], and state as follows in support:

## <u>INTRODUCTION</u>

      Plaintiffs Jeanne Stroup and Ruben Lee had more than 70 years of combined, consistently successful experience with Defendant United Airlines, Inc. ("United") when the airline discharged them in November 2013 for the demonstrably pretextual reason that they very briefly watched an iPad video and sat on carrier boxes, and failed to wear their aprons and name bars, during just <u>one flight</u> on September 20, 2013. In reality, Defendant United forced Mr. Lee and Ms. Stroup to retire because of their ages. Neither Plaintiff had ever received a disciplinary write-up for performance-related issues from Defendant before that September 20 flight, but had earned many accolades from coworkers, superiors, and customers during their decades of loyal

service to the airline – including unsolicited praise from a satisfied coworker and customers for their performance *in September 2013.*

Defendant United admits that it failed to engage in any performance management or progressive discipline before discharging Mr. Lee and Ms. Stroup, even though performance management is United's typical response to relatively minor offenses like those which Plaintiffs committed during the September 20 flight. Moreover, the percentage of United's Denver-based flight attendants under the age of forty has more than *tripled* between the years 2013 and 2015, and a number of United's key witnesses have provided utterly contradictory testimony regarding material issues in the case. Because there are many hotly-disputed issues of material fact and many serious questions regarding the credibility of United's key witnesses that a jury must resolve, and because there exists ample evidence based upon which a jury could reasonably conclude that Defendant United discharged Plaintiffs because of their ages, Defendant's Motion for Summary Judgment [Doc. 67] must be denied.

## <u>RESPONSE TO MOVANT'S MATERIAL FACTS ("RMMF")</u>[1]

1.      Admit that ensuring safety is a duty of United flight attendants. Deny that customer safety is invariably a paramount or even important concern to Defendant United, as United risks customer safety during almost every flight by instructing its flight attendants to push carts filled with food and drink down with the middle of the aisle just to sell products, although the carts could severely injure customers in response to turbulence.  Ex. 1, *Deposition of Mark Dodge*, at 52:6-14. United's own employees even provided conflicting and irreconcilable testimony regarding the significance (or lack of significance) of the so-called safety infractions that Plaintiffs committed during the September 20 flight. *Compare* Ex. 2, *Deposition of Robert*

---

[1] All of the facts and legal analysis herein are set forth for purposes of summary judgment only.

*Krabbe*, at 56:1-14 ("Q:·Would you agree with me that if a flight attendant were to light a campfire in a lavatory bathroom that would be a more serious safety violation than watching an iPad video during flight? /. . .  A: ·Yes") *with* Ex. 3, *Deposition of Deepesh Bagwe*, at 55:1-4 ("Q: You think lighting a campfire in the bathroom and watching a video are equally serious.· Is that what you're telling me? / A: Yes."); *see also* Ex. 4, *Deposition of Ken Kyle*, at 83:1-22.

      2.     Plaintiffs lack sufficient information to address the substance or even the existence of this unwritten, off-the-record purported complaint from August 2013; admit that Plaintiffs' supervisor, Mark Dodge, *claimed* to have received this unsubstantiated verbal complaint from a single flight attendant, and admit that Mr. Dodge was just 38 years old at the time, whereas Plaintiff Stroup was 54 years old and Plaintiff Lee was 61 years old at the time. *See* Ex. 4, *Deposition of Ken Kyle*, at 31:2-6.

      3.     Plaintiffs lack sufficient information to address all of Mr. Dodge's described communications with Mr. Whittaker. Deny that Dodge was required to obtain a written statement before starting an investigation, or before simply counseling Mr. Lee and Ms. Stroup that he had received a complaint about them (assuming he actually received such a complaint) and that they should stop doing what they were accused of doing; a fact dispute exists regarding these material issues. *Compare* Ex. 1, *Deposition of Mark Dodge*, at 66:16-73;11 ("A: Well, without getting something in writing, I couldn't actually start an investigation to find out whether I had a reason to or not. / Q: Where is that policy that says you need something in writing before you can start an investigation?" / A: It's -- I believe it's in the contract that any adverse document has to be -- the person who's lodging the complaint has to be identified. . . . Q: You could have simply picked up the phone, called Ruben Lee or Jeanne Stroup, and said, Hey, I've got this complaint from somebody, I'm not telling you who, that you guys did this.· Is it true?· You could have

done that, right? . . . A: I wouldn't have felt comfortable doing that.") *with* Ex. 4, *Deposition of Ken Kyle*, at 43:15-44:7 ("Q: So assuming it's true that Mr. Dodge did receive this off-the-record report back in August of 2013 about Mr. Lee and Ms. Stroup watching an iPad video during a portion of a flight, is there anything in United's contract with the AFA that would have prevented him simply from going to Mr. Lee and Ms. Stroup and telling them not to do that again? / . . . A: Nothing that would have prevented that. Q: So he could have just said, Hey, guys, don't watch iPads during flight -- . . . as opposed to this whole disciplinary process we've been discussing? . . . A: Correct."). Admit that Whittaker is several years younger than both Plaintiffs.

4.      Deny. A jury question exists regarding at least Whittaker's and Dodge's age-discriminatory motive in ordering Bagwe to scrutinize Plaintiffs' conduct alone during the fight, Bagwe's age-discriminatory motive during the flight, and Bagwe's, Dodge's, and Whittaker's age discriminatory motives in their subsequent dealings with Plaintiffs. Defendant United allowed *more than one month* to elapse between when Dodge claimed to have received a complaint from a flight attendant regarding Plaintiffs' purported watching of an iPad video during flight, and when Defendant United first attempted to do anything at all about it (by ordering Bagwe to secretly watch Plaintiffs alone in order to help United build a pretextual basis for firing them), even though Plaintiffs had been flying regularly during that whole month. A jury is thus entitled to disbelieve Defendant's assertion that Plaintiffs committed termination-worthy offenses by watching an iPad video because they so "egregiously" compromised customer safety, as Defendant United did nothing in response to this purportedly "grave" safety concern for several weeks after purportedly first being alerted to it in August 2013. A jury could instead reasonably conclude that United's articulated explanation for inordinately scrutinizing

and then summarily discharging Plaintiffs is illegal pretext. Providing further proof of United's age-discriminatory motive, Bagwe's report that he submitted to Dodge, which Dodge then approved, contains blatantly ageist language, as Bagwe describes a customer on the September 20 flight as an "old lady." *See* Ex. 5, *Bagwe's Report*. Likewise, the report amounts to an unmitigated (and in some cases completely false, *see* **RMMF** ¶ 12) attack on Plaintiffs' performance even though it was supposed to be a balanced "unannounced excellence review," not a hit piece, and Plaintiffs did in fact perform well during much of the flight, *see* **SADF** ¶ 11. This is all the more damning to United because Bagwe admitted to having conducted fifty unannounced excellence reviews during his career with United, and admitted that his review of Plaintiffs was the *only* one where he had been ordered ahead of time to scrutinize the conduct of just certain flight attendants; Bagwe also admitted that his secret review of Plaintiffs was the *only* one during his whole career that led to the employees who he secretly reviewed being fired. Ex. 3, *Deposition of Deepesh Bagwe*, at 60:2-62:20.[2] Another disputed issue of material fact exists regarding *who* ordered Bagwe to subject Plaintiffs alone to heightened scrutiny during the

---

[2] Alternatively, Bagwe testified falsely under oath regarding this material issue (thereby creating another credibility determination which a jury must resolve). After Bagwe was deposed, the Court ordered Defendant United to produce all of Bagwe's other so-called unannounced excellence review reports related to flight attendants. [Doc. 76]. United subsequently asserted in its written discovery response that Bagwe had not prepared ***any other*** excellence performance reviews related to flight attendants. Ex. 37, Stroup/Lee 002706 *E-mail from Meghan Martinez regarding Discovery Responses*. The most logical conclusion to draw from this written discovery response is that either (1) Defendant United falsely asserted in its written discovery response that Bagwe has prepared no other unannounced excellence reviews related to flight attendants when he had in fact prepared others, or (2) Bagwe lied under oath about unannounced excellence reviews of flight attendants being commonplace in order to whitewash his inordinate and highly-irregular (and age-based) scrutiny of Plaintiffs during the September 20 flight. It is exceedingly unlikely that Bagwe has prepared approximately 50 unannounced excellence reviews of United employees other than flight attendants (such as pilots, despite not being a pilot himself; Bagwe is a flight attendant supervisor) and, in any event, these material questions certainly warrant exploration at trial.

September 20 flight. Dodge testified that he had no idea who ordered Bagwe to take the flight and that it was possible Bagwe may have just randomly chosen to conduct his surreptitious review of Plaintiffs, whereas Kyle testified that Dodge admitted at Plaintiffs' November 5, 2013 hearing that he (Dodge) had personally asked Bagwe to secretly monitor Plaintiffs – and only Plaintiffs – during the September 20 flight.  Ex. 1, *Deposition of Mark Dodge*, at 107:10-24; Ex. 4, *Deposition of Ken Kyle*, at 35:25-36:15.

5.      Admit.

6.      Admit.

7.      Admit in part; unlike Plaintiffs, Defendant United lacked a pretextual basis to subject these two other flight attendants to heightened scrutiny during the flight because of their ages (assuming United received the off-the-record report about Plaintiffs in August 2013).

8.      Admit in part, subject to the critical caveats that Mr. Lee and Ms. Stroup each only had an earbud in one of their ears and could always hear what was going on in the cabin with their other ears; that Mr. Lee and Ms. Stroup only watched the iPad video for a total of five minutes at most during the entire flight, only did this after providing regular cabin service and, even then, only watched the video intermittently while also talking to passengers and tending to their duties in the back of the galley; that Mr. Lee and Ms. Stroup sat on the carrier boxes for no more than five minutes total during the whole flight; that Mr. Lee only pulled out the carrier boxes because they were malfunctioning and not going all the way into their housing (and eventually took the initiative to fix them both); and that Supervisor Dodge admitted that he never received a single customer complaint about Mr. Lee's or Ms. Stroup's service, demeanor, attentiveness, professionalism, or performance during the September 20 flight.  Ex. 6, *Deposition*

*of Jeanne Stroup*, at 61:1-62:20, 64:18-65:23; Ex. 7, *Deposition of Ruben Lee*, at 60:4-12, 130:18-131:9; Ex. 1, *Deposition of Mark Dodge*, at 28:9-22.

9.      Admit in part; however, flight attendants routinely engage in activity (such as chatting with each other and customers after providing cabin service) which reduces their attention to safety issues in the cabin, but are not even disciplined by Defendant United for it; not all so-called cabin safety concerns are equally serious or even significant to United; and Defendant United regularly reduces cabin safety during flights merely to sell products to its customers. *See* **RMMF** ¶ 1; *see also* Ex. 8, *Deposition of Bill Knudsen*, at 38:21-39:24.

10.     Deny. Plaintiff Lee observed Bagwe behaving suspiciously with his phone out and both Plaintiffs were acutely aware of Mr. Bagwe's scrutiny of them – and the accompanying security risk he posed – as he loitered near them and watched them alone for an excessive period of time. Plaintiffs became so concerned about Bagwe's inordinate scrutiny of them that they asked him to return to his seat, and discussed calling the cockpit to alert the pilots to his peculiar conduct (but then the seat belt sign came on and he returned to his seat in response).  Ex. 7, *Deposition of Ruben Lee*, at 66:1-67:4, 68:15-23.

11.     Plaintiffs lack sufficient information to admit or deny Bagwe's purported timeline of events; in any event, Plaintiffs sat on the carrier boxes and watched the video for no more than five minutes total during the entire flight. *See* **RMMF** ¶ 8.

12.     Plaintiffs' response to each subpart follows. Also applicable to each subpart is the general point that neither Mr. Bagwe nor any other Defendant United employee counseled Plaintiffs at the time regarding the purported infractions they committed during the flight, even though Mr. Bagwe claimed under oath that Plaintiffs' conduct (very briefly watching an iPad video and sitting on carrier boxes near the aft galley) was so dangerous that it was akin to

lighting a fire inside the plane. *See* **RMMF** ¶ 1. A disputed issue of material fact therefore exists as to whether Defendant's characterization of Plaintiffs' alleged conduct is unworthy of credence and instead pretext for illegal age discrimination because, surely, if Plaintiffs' conduct was as dangerous as Defendant and its agents have insistently claimed, then someone would have sought to immediately stop Plaintiffs in order to protect customers' and crewmembers' safety. *See* **RMMFs** ¶¶ 1, 4.

a.     Admit that Plaintiffs committed this so-called offense during one flight – an "infraction" that even Defendant United has conceded is "minor."  Ex. 2, *Deposition of Robert Krabbe*, at 62:16-63:9. Ms. Stroup did not wear her apron and name bar because she had spilled water on her apron and the name bar was affixed to the apron.  Ex. 6, *Deposition of Jeanne Stroup*, at 148:18-149:14. Mr. Lee accidentally forgot his apron with the name bar attached to it at home.  Ex. 7, *Deposition of Ruben Lee*, at 149:18-150:2. Defendant United's typical disciplinary response to this "offense" is merely a verbal warning, at worst.  Ex. 8, *Deposition of Bill Knudsen*, at 47:6-13 (not a termination-worthy "offense"), 68:11-19.

b.     Deny. Bagwe falsely claimed Mr. Lee did this in an attempt to help United build a pretextual basis for terminating Mr. Lee because of his age.  Ex. 9, Depo. Ex 23 at 4, *Plaintiff Lee's Responses to Defendant's Discovery Requests*; Ex. 7, *Deposition of Ruben Lee*, at103:23-105:15.

c.     Admit that Lee gave out one free bottle of alcohol to a customer who was seated in economy-plus because that customer had moved seats in order to accommodate a family, and that United's unwritten, actual practice is to permit flight attendants to make an individualized assessment regarding when to give a customer a complimentary drink.  Ex. 7, *Deposition of Ruben Lee*, at 127:11-128:4. Therefore, Mr. Lee did not even violate United's actual policies by

providing one complimentary drink to one customer during one flight, much less commit an offense meriting termination.

d.      Admit that Mr. Lee *may* have given out one full soda can to one passenger during one flight although the passenger had not explicitly requested it; Mr. Lee could not remember whether he did this extremely trivial thing; however, Mr. Lee's usual practice was to follow procedure and give out a full can only when asked for a full can.  Ex. 7, *Deposition of Ruben Lee*, at 126:12-23. Assuming, *arguendo*, that Mr. Lee gave out a full can of soda without being asked for it, deny that this was a serious offense, and deny that this was a termination-worthy offense.

e.      Deny. Bagwe falsely claimed Mr. Lee smoked an electronic cigarette during flight in an attempt to help United build a pretextual basis for terminating Mr. Lee because of his age. Ex. 7, *Deposition of Ruben Lee*, at 153:2-154:16. As Mr. Kyle testified, if Mr. Lee really had been smoking (Mr. Lee was not), there would have been plumes of smoke emanating from the cigarette; in contrast, Bagwe untruthfully alleged that Mr. Lee was smoking while creating very little smoke.  Ex. 4, *Deposition of Ken Kyle*, at 140:3-141:19.

13.     Admit.

14.     Admit in part; however, Plaintiffs' were not intentionally untruthful at any point during the investigation. *See* **RMMFs** ¶¶ 19-20.

15.     Admit in part; Plaintiffs honestly admitted to watching the iPad video and sitting on carrier boxes very briefly, and failing to wear their aprons and name bars; Mr. Lee also stated that he gave out a complementary alcoholic beverage to a deserving customer and that he had an electronic cigarette on board which he did not and could not smoke (because it had a dead

battery). Deny that either Plaintiff's credibility was ever legitimately in question. *See* **RMMFs** ¶¶ 8, 12, 16.

16.     Deny. Plaintiffs testified under oath that they watched the iPad video intermittently for no more than five minutes during the whole flight. *See* **RMMF** ¶ 8. Whatever the unverified complaint states is irrelevant and inadmissible at trial, and any difference between the complaint and Plaintiffs' testimony specifically addressing the video is attributable to an inadvertent drafting error in the complaint; Plaintiffs' testimony specifically addressing the video is the more accurate of the two. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) (substance of the evidence submitted at summary judgment must be admissible at trial); *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992) (unverified assertion by counsel does not "suffice for evidence or fact" for purposes of summary judgment).

17.     Admit that United's written policy at the time prohibited flight attendants from using personal electronic devices during flight, but that United's *actual practice* was to permit flight attendants to engage in the same and substantially similar conduct, such as reading books and magazines during flight, without even disciplining the involved flight attendants in many instances, and without terminating the involved flight attendants for it absent any progressive discipline in all instances.  Ex. 8, *Deposition of Bill Knudsen*, at 38:3-41:23, 43:25-44:2; Ex. 4, *Deposition of Ken Kyle*, at 85:25-86:19; *see also* **RMMF** ¶ 59, below. Therefore, it was entirely understandable why Plaintiffs did not knowingly violate United's written electronic device policy contained in its more than 300-page Flight Attendant Information Manual at the time (and why an informal verbal counseling or progressive discipline (at worst) were the only fitting responses from Defendant United).  Ex. 6, *Deposition of Jeanne Stroup*, at 235:24-236:23; Ex.

10, DEF 519-865, *United Airlines Flight Attendant Information Manual*; *see also* Ex. 11, *Meadows Decl.* ¶ at 10 ("If Ruben Lee failed to wear an apron, watched a personal iPad video, and sat on a carrier box in the aft galley during just one flight, I would expect United to address these issues with a verbal warning, letter of charge or maybe, at worst, a hearing resulting in discipline less than termination, based on my observations. I have never observed or heard of United management firing otherwise solidly-performing flight attendants for such relatively minor infractions without proper steps of disciplinary actions first. If that's the leg United is standing on to defend its decision to fire Ruben or Jeanne Stroup - this is really unfair and hard to believe, based on my observations and experiences at United."). Also admit that United now *permits* flight attendants to use electronic devices on-board during flight for business purposes, and that (as a matter of commonsense) flight attendants' resulting inattention to safety issues on the aircraft is the same whether or not they are using the device for personal or business purposes.

18.     Admit, subject to the crucial reservation that no discipline or progressive discipline are United's typical disciplinary responses to offenses of this nature. *See, e.g.*, **RMMF** ¶ 17.

19.     Deny that Mr. Lee ever was untruthful because he wrote what he honestly remembered at the time; Mr. Lee's memory was justifiably impaired at the time because he "walked in under extreme stress, duress; [he] was blindsided, and [he] was scared." Ex. 7, *Deposition of Ruben Lee*, at 162:2-18; *see also* Ex. 7, *Deposition of Ruben Lee*, at 163:13-22; 165:4-16.

20.     Deny that Ms. Stroup was untruthful because she wrote what she honestly remembered at the time under the intense duress United had created by blind-siding her; despite

her duress, Ms. Stroup still honestly asserted in that statement (in an excerpt Defendant tellingly omits from its motion for summary judgment) to having looked at pictures and reading her Nook on prior flights.[3] *See* Ex. 19 to Defendant's Motion for Summary Judgment, *Flight Attendant Report*; Ex. 6, *Deposition of Jeanne Stroup*, at 131:14-132:13.

21.     Admit in part, subject to the crucial reservation asserted elsewhere (*see, e.g.*, **RMMF** ¶ 12(a)) that no discipline or progressive discipline are United's typical disciplinary responses to offenses of this nature.

22.     Deny. *See* **RMMF** ¶ 12(b). Though Mr. Lee stated that he was briefly, involuntarily knocked sideways during part of the safety demonstration, he did not admit that he stood in an improper position during the entire demonstration, or that he ever made a volitional choice to stand in an improper position.

23.     Admit in part, subject to the reservations stated at **RMMF** ¶ 12(c).

24.     Admit in part; however, United deliberately caused Mr. Lee to feel very scared and blind-sided at the time and he was not thinking clearly as a result. *See* **RMMF** ¶ 19; *see also* **RMMFs** ¶¶ 12(e), 15 (Lee never smoked a cigarette in the aircraft).

25.     Admit.

26.     Admit the Collective Bargaining Agreement ("CBA") so states.

27.     Admit United's paid employees with an obvious motive to whitewash Defendant United's illegal treatment of Plaintiffs (including fear that United may retaliate against them if they testified in a manner that could be perceived as unfavorable to the airline) so stated. *See, e.g.*, Ex. 4, *Deposition of Ken Kyle*, at 82:14-17 ("Q: But United does write your paychecks,

---

[3] Conduct of this nature is commonplace among United flight attendants and, based on United's actual practices, has not and does not warrant immediate termination, especially absent any progressive discipline. *See* **RMMF** ¶ 17.

right? / A: Correct. Correct.· At least up to today . . . [.]"); *see also* **RMMFs** ¶ 8 (Lee only pulled out carrier boxes because they were malfunctioning and would not go completely into compartment); ¶ 9 (mere fact that flight attendant compromises safety does not invariably violate United policy, much less constitute a serious or termination-worthy offense, based on United's actual practices).

28.     Admit.

29.     Admit in part; though a Letter of Charge ("LOC") itself may not constitute discipline in a hyper-technical sense, LOCs are a precursor to termination, which is the highest level of discipline United can impose, and LOCs were in fact precursors to Mr. Lee's and Ms. Stroup's terminations.  Ex. 6, Deposition of Jeanne Stroup, at 90:22-91:8.

30.     Admit that the letters so stated.

31.     Admit that the letters so stated.

32.     Admit that her letter so stated.

33.     Admit that his letter so stated; however the accusations at 33(a)-(b) were false. *See* **RMMF** ¶ 12.

34.     Deny. Defendant's actual policy based on its actual practices is to treat some policy violations as more serious than others, *see e.g.*, **RMMFs** ¶¶ 1, 9, 12; *see also* Ex. 12, *Deposition of Dean Whitaker*, at 24:3-22; these practices had not been fully explored in connection with the instant case when Plaintiffs were deposed because United's Rule 30(b)(6) deponent and United employees Ken Kyle, Deepesh Bagwe, Mark Dodge, Dean Whittaker, and William Knudsen had not been deposed at the time.

35.     Admit.

36.     Admit.

37.     Admit. Notably absent from the hearing was Deepesh Bagwe, the critical eyewitness who had (in some cases falsely) accused Plaintiffs of violating United policy during the September 20 flight. Thus, neither Plaintiff ever had an opportunity to confront or to cross examine their main accuser at any time during their hearings even though their careers were on the line.  Ex. 4, Deposition of Ken Kyle, at 41:5-10.

38.     Admit.

39.     Admit Kyle did not recall Plaintiffs mentioning age discrimination to him, but deny that this is the least bit notable because union representative Ken Kyle was not representing Plaintiffs on any age-related claim.  Ex. 4, Deposition of Ken Kyle, at 129:20-23

40.     Admit.

41.     Deny. Whittaker told Kyle that a decision <u>had</u> been made to terminate Stroup's and Lee's employment if they did not retire within just a few days.  Ex. 4, Deposition of Ken Kyle, at 58:17-62:3; Ex. 13, Depo Ex. 50, *E-Mail between Jeanne Stroup, Dean Whittaker, and Ken Kyle*; Ex. 12, *Deposition of Dean Whittaker*, at 105:24-120:11 (admitting that he received and reviewed email from Stroup asserting that Kyle informed her that she had the choice of immediately retiring or being fired before Stroup submitted her retirement, but that he deliberately failed to respond to her). Notably, Whittaker both denied and admitted that he made the decision to terminate Plaintiffs' employment during his deposition; both positions cannot be true and Whittaker therefore testified falsely under oath regarding this material issue. *Compare* Ex. 12, *Deposition of Dean Whittaker*, at 84:6-17 ("Q: And it's your claim that they weren't even discharged? / A: They were not. / Q: So if they retired, then there can't be any age discrimination in your mind, right? A: Well, I -- they retired.· I -- I never discharged them. / Q: You never disciplined them at all, did you? A: No. Q:·Okay.· So did you – A: Me personally, no.") *with* Ex.

12, *Deposition of Dean Whittaker*, at 98:12-15 (Q: Okay. You told Ken Kyle, the union rep, that a decision had been made to terminate Ruben Lee and Jeanne Stroup, didn't you? / A: That is true."); 17:17-19 ("Q: Okay.· And did you make the decision to terminate them? / A:·I did."); *see also* Ex. 14, Depo Ex. 49, *E-Mail from Dean Whittaker* (Whittaker eventually admitted to writing which, in reference to Plaintiff Lee, stated "INVOLUNTARY EMLPOYEE TERMINATION," and provided "Description(s) of reason(s) that employee is being terminated").

42.     Admit in part; deny that Plaintiffs voluntarily retired. They had no reasonable alternative to retiring under the intolerable circumstances United internationally created. A summary of those circumstances follows (and is supported by the evidence at Ex. 15, Depo. Ex. 3, *Complaint and Jury Demand*, Ex. 6, *Deposition of Jeanne Stroup*, at 234:1-10; Ex. 7, *Deposition of Ruben Lee*, at 183:22-185:22, 218:21-221:6; Ex. 16, Depo. Ex.43, *Ken Kyle Decl.*; Ex. 4, *Deposition of Ken Kyle*, at 122:20-127:13; 4.

On Friday, November 15, 2013, after business hours, Mr. Lee and Mrs. Stroup both received calls from AFA Representative Kyle, during which they received ultimatums that United would send letters of termination out to each of them on November 19, 2013, if they did not retire by Monday, November 18, 2013. AFA Representative Kyle explained that he talked to Director of Inflight Services Denver/New York Whittaker earlier that day, and that Whittaker told him United was going to terminate Mr. Lee and Mrs. Stroup immediately.  AFA Representative Kyle also stated to both Mr. Lee and Mrs. Stroup that he convinced United to give them a few days to retire and explained the illusory "options" available to each of them. On the one hand, AFA Representative Kyle said that they could fight their terminations. He explained that the upside to this approach was that they could potentially keep their jobs with

United if they prevailed, and the downsides were that it could take a year or more for their appeal hearings to occur, and that they would be treated as terminated employees by United while their appeals were pending, meaning that they would lose their retiree medical benefits along with their retiree pass privileges. Additionally, he advised them that, if they lost their appeals, they would no longer be eligible for retiree medical benefits and retiree pass privileges.

Fighting their terminations was not a feasible option for Mr. Lee or Mrs. Stroup under the circumstances. They reasonably believed having a termination on their employment records would significantly increase their difficulty in finding other jobs – a difficulty further compounded by Mr. Lee's and Mrs. Stroup's ages, as older individuals face particularly significant challenges finding employment. Additionally, Mr. Lee and Mrs. Stroup believed they would lose all the considerable retiree medical and travel benefits they earned during their approximately 35 and 40 years of service, respectively, if United fired them.

On the other hand, AFA Representative Kyle advised Mr. Lee and Mrs. Stroup that they could submit notices of their retirements to United in lieu of being terminated. He explained that they would not lose their retiree medical benefits if they retired, and that they might also still be eligible for retiree pass privileges. AFA Representative Kyle also stated to each of them that, if you have reached a decision, you should not wait until the last minute to notify United because of the complexity of the internal United system for processing retirement notifications, and the associated risk that their retirements would not become official before United's November 20, 2013 deadline for mailing their written notices of termination.

On Monday, November 18, 2013, Mrs. Stroup sent an email to Director of Inflight Services Denver/New York Dean Whittaker asking for his decision in writing – the decision being (as Mrs. Stroup understood it to be), you decided to terminate me unless I retire

immediately. AFA Representative Kyle, who was cc'd, sent Mrs. Stroup an email reply asking her to not send emails to her supervisor without first getting his permission. Mrs. Stroup never received a written response to her November 18 email from United. Director of Inflight Services Denver/New York Whittaker deliberately failed to respond to Mrs. Stroup's November 18 email so that he personally did not have to state United's ultimatum in writing. Nonetheless, United's ultimatum to Mr. Lee and Mrs. Stroup was abundantly clear.

Under the intense duress which United created, Mrs. Stroup and Mr. Lee submitted their notifications of retirement to United on November 18, 2013, in lieu of being immediately terminated. All other options that Plaintiffs understood to be available to them at the time would have left them markedly worse off than retiring.

43.     Admit in part; however, Plaintiffs did not voluntarily retire. *See* **RMMF** ¶ 42.

44.     Admit Kyle so stated; however, Kyle characterized the "options" he presented to Plaintiffs (which Whittaker had previously conveyed to him) as an "ultimatum" from United when he communicated with Plaintiffs in November 2013.  Ex. 6, *Deposition of Jeanne Stroup*, at 199:5-19. Moreover, Defendant United <u>did</u> present an ultimatum to Plaintiffs: retire immediately or be fired. *See* **RMMF** ¶ 42.

45.     Admit in part; deny that Plaintiffs had any reasonable "option" available to them at the time besides retiring. *See* **RMMF** ¶ 42.

46.     Deny. Plaintiffs understood that a decision <u>had</u> been made to terminate them <u>if</u> they did not immediately retire. *See* **RMMFs** ¶¶ 41-42.

47.     Admit in part; while Plaintiffs theoretically *could* have waited, *if* Plaintiffs had waited to see Defendant's written decision, then they would have been terminated and therefore would have lost the ability to retire along with the accompanying retirement benefits they had

earned over the course of more than seventy years of combined service to United. *See* **RMMFs** ¶¶ 41-42.

48.     Admit in part; however, **RMMF** ¶ 42 provides a more complete and accurate description of the relevant circumstances; deny that Plaintiffs had any reasonable "option" besides retiring.

49.     Admit in part; however, **RMMF** ¶ 42 provides a more complete and accurate description of the relevant circumstances.

50.     Admit in part; however, **RMMF** ¶ 42 provides a more complete and accurate description of the relevant circumstances. Also notable, Ken Kyle testified that he has been a Denver-based flight attendant for United for 28 years and President of the Denver chapter of the Association of Flight Attendants, CWA since 2008, and that he has *never* observed a grievance from a termination decision resulting in a person being reinstated and given back pay and benefits.  Ex. 4, *Deposition of Ken Kyle*, at 3:10-4:19, 130:12-15; *see also* Ex. 6, *Deposition of Jeanne Stroup*, at 96:6-12 (unware of anyone *ever* successfully grieving a termination decision made by Defendant United).

51.     Admit in part; however, **RMMF** ¶ 42 provides a more complete and accurate description of the relevant circumstances; deny that Plaintiffs had any reasonable "option" besides retiring.

52.     Admit.

53.     Admit.

54.     Admit only that the forms so stated; deny either Plaintiff's retirement was objectively voluntary, as they had no reasonable alternative to retiring under the onerous circumstances created by Defendant United. *See* **RMMF** ¶ 42.

55.     Admit only that the form so stated; deny either Plaintiff's retirement was objectively voluntary, as they had no reasonable alternative to retiring under the onerous circumstances created by Defendant United. *See* **RMMF** ¶ 42.

56.     Admit only that the form so stated; deny either Plaintiff's retirement was objectively voluntary, as they had no reasonable alternative to retiring under the onerous circumstances created by Defendant United. *See* **RMMF** ¶ 42.

57.     Admit Whittaker deliberately refused to give Ms. Stroup a written decision at the time despite knowing that she had requested a written decision from him immediately, and despite being aware that Ken Kyle had advised Mr. Lee and Ms. Stroup that he (Whittaker) had made a decision to terminate them both if they did not immediately retire. *See* **RMMF** ¶ 41.

58.     Admit Whittaker deliberately refused to give Mr. Lee a written decision at the time despite knowing that Ms. Stroup had requested a written decision from him immediately, and despite being aware that Ken Kyle had advised Mr. Lee and Ms. Stroup that he (Whittaker) had made a decision to terminate them if they did not immediately retire. *See* **RMMF** ¶ 41.

59.     Admit only that Plaintiffs so stated when asked improper legal questions during their depositions. Mr. Lee and Ms. Stroup are career flight attendants, not attorneys, have no formal legal training or education, and were deposed before any of United's employees or representatives in this matter.  Ex. 6, *Deposition of Jeanne Stroup*, at 228:21-230:3; Ex. 7, *Deposition of Ruben Lee*, at 210:9-214:10. Moreover, third party witnesses *have* averred under oath that they observed Defendant United treat similarly situated employees to Plaintiffs, who were younger than Plaintiffs, to more favorable terms and conditions of employment than Plaintiffs. *See* Ex. 17, *Salazar Decl.* at ¶ 8 ("There is absolutely an age bias that exists at United. It seems that senior flight attendants over the age of approximately 50 have been victims of

particular scrutiny from management."), Ex. 18, DEF 2522; Ex. 19, *Defendant's First Supplemental Discovery Responses*; [DOC. NO. 60] (Supervisor Dodge supervised Salazar for more than four months); Ex. 20, *Stroup Decl.* at ¶¶ 7-8, 10-12 ("United has engaged in a pattern of hiring and firing practices that favor younger employees and disfavor older ones. It was clear from my observations that United wanted to have a certain stock of flight attendants who are mostly young, thin, and relatively attractive, and if you did not fit what it wanted, that person needed to learn to protect themselves. . . . It was my observation that no one was totally and completely safe from United management or from the risk of being terminated, but United especially closely watched and nitpicked the performance of older flight attendants - like Jeanne and Ruben. I also observed United discriminating against older flight attendants for taking their sick time. Flight attendants, at least when I worked there, received 4 hours of sick time a month and many flight attendants banked many hours over the years. It was our right to use those but if you called more than twice a year to use sick time, United really harassed you. Older flight attendants tend to have more medical issues, and need to take more sick time as a result. But instead of being compassionate with the older attendants, United used that as an excuse to discipline them. In my observation, it is more of a problem for United the older an attendant happens to be."); Ex. 11, *Meadows Decl.* at ¶¶ 7-9 ("United offered me $100,000 to retire. United offered my wife the same amount to retire at about the same time. I was 64 and she was 64 at the time. I had 42 ½ years of experience with United, and she had 44 years and 9 months of experience with United at the time. We both were Denver-based flight attendants when we retired. My wife and I were lucky to be able to leave United on our terms, rather than being terminated for some insignificant offense. Starting around the year 2013, my wife and I observed that we became vulnerable to being fired by United, despite our decades of experience and

excellent performance histories."). Further, Director of Inflight Services Denver/New York Whittaker *has* subjected younger, similarly situated employees to Plaintiffs to less severe discipline than Plaintiffs even though they committed far more serious policy violations than Plaintiffs committed. On March 19, 2012, Whittaker issued a Denver-based flight attendant named Meredith Broome a performance letter of charge for being visibly intoxicated in a hotel lobby during a layover. Specifically, the letter of charge asserted that:

> Ms. Broome was observed within 12 hours of her scheduled departure on February 12, 2012 as not being able to stand on her own accord or give coherent information by hotel staff of the JW Marriott New Orleans. Acting purser Thoa Yeung was contacted by the hotel manager and informed of a disturbance in the lobby involving Ms. Broome. After observing Ms. Broome handcuffed and being taken by ambulance for treatment, she contacted the crew desk and informed them of the situation, resulting in Ms. Broome being replaced on ID 1372.

Ex. 21, Stroup/Lee 2399-2400, *Meredith Broome's Letter of Performance*. Even though Ms. Broome had been extremely drunk while on the job, Whittaker issued a Performance Letter of Warning Level 4 to her, which falls short of termination. Ms. Broome was just 43 or 44 years old at the time. *See* Ex. 22, Stroup/Lee 002701, *Public Records Search for Meredith Broome*, see also Ex. 22, Stroup/Lee 002702, *Accurint Search for Meredith Broome*.

60.     Admit only that Plaintiffs so stated when asked improper legal questions during their depositions. *See* **RMMF** ¶ 59 (describing evidence of Defendant United subjecting its older flight attendants (in addition to Plaintiffs) to age discrimination).

61.     Admit only that Mr. Lee so stated when asked improper legal questions during his deposition. *See* **RMMF** ¶ 59. Moreover, *Defendant* can specifically identify only *one* other person among hundreds of Denver-based flight attendants who it has terminated for committing a similar offense to Plaintiffs. That Denver-based flight attendant, P.C., was observed by *multiple* crew members using a personal electronic device during a flight in 2013 (only Bagwe

complained about Plaintiffs), she had not been singled out for a surreptitious unannounced excellence review at the time (unlike Plaintiffs), Ms. C may have been using the device during meal service in addition to between regular cabin service (unlike Plaintiffs), and Ms. C had an extensive history of significant discipline before the incident, including a recent performance letter of warning which put her on *the last step of the progressive discipline track at the time*. Thus, United had already subjected Ms. C to multiple steps of progressive discipline before the iPad incident, and that incident was the last straw in a long line of performance problems.  Ex. 2, *Deposition of Robert Krabbe*, at 31:21-39:24. Defendant has therefore failed to identify a *single* individual besides Plaintiffs who the airline has fired for committing comparable offenses to Plaintiffs without *any* progressive discipline, even though flight attendants regularly engage in the same and similar conduct as Plaintiffs did, such as not wearing aprons and name bars, and reading books and magazines and chatting with each other during flight. *See* **RMMF ¶** 17; *see also* Ex. 7, *Deposition of Ruben Lee*, at 215:1-24; Ex. 7, *Deposition of Jeanne Stroup*, at 237:1-20.

62.    Admit only that Mr. Lee so stated when asked improper legal questions during his deposition. *See* **RMMF ¶** 59.

63.    Admit Defendant's cherry-picked statistics so state. However, these statistics provide a materially incomplete picture because the more relevant and probative statistic is the *change* in the distribution of Denver-based flight attendants under the age of 40 from the years 2013 to 2015; at the end of 2013, approximately 8% of United's flight attendants were under the age of 40 but, by the end of 2015, approximately 25% of United's Denver-based attendants were under the age of 40; thus, the percentage of flight attendants under the age of 40 *more than tripled* within the few years after United forced Plaintiffs to retire. *Compare* Ex. 30, DEF 2239

*with* Ex. 24, DEF 2578; *see also* Ex. 4, Deposition of Ken Kyle, at 87:25-88:9. United's Direct, Inflight Services Dean Whittaker (who made the decision to terminate Plaintiffs) supervised all of United's Denver-based flight attendants during this whole time period.  Ex. 25, Stroup/Lee *Dean Whittaker's LinkedIn*.

64.     Admit Plaintiffs believe United illegally forced them to retire because of their ages; deny that Plaintiffs' claim is based only on their "feelings," as there is a plethora of other evidence discussed elsewhere herein which supports Plaintiffs' legal claims and, at a bare minimum, precludes the entry of summary judgment in Defendant's favor.

65.     Admit Ms. Stroup did not claim that United subjected her to age discrimination before September 2013 when asked improper legal questions during her deposition. *See* **RMMF** ¶ 59.

66.     Admit Mr. Lee did not claim that United subjected him to age discrimination before September 2013 when asked improper legal questions during his deposition. *See* **RMMF** ¶ 59.

67.     Admit in part; Stroup received less pay from Defendant United during United's fall 2013 investigation of her which culminated in her forced retirement. *See* **RMMF** ¶ 69.

68.     Admit in part; Lee received less pay from Defendant United during United's fall 2013 investigation of him which culminated in his forced retirement. *See* **RMMF** ¶ 69.

69.     Deny. Plaintiffs did not receive extra meal money and were unable to pick up any extra trips (for which they would have been paid) because United suspended them. Ex. 6, *Deposition of Jeanne Stroup*, at 185:2-20.

<u>**STATEMENT OF ADDITIONAL DISPUTED FACTS ("SADF")**</u>

1.      Defendant United applies two progressive discipline tracks to its flight attendants pursuant to a Letter of Agreement with the Association of Flight Attendants: one for attendance issues  and the other for performance issues; there are four steps of discipline under each track which are less severe than termination; Defendant could have placed Plaintiffs on the performance progressive discipline track for their alleged offenses instead of firing them without giving them any chance to improve their performance – and United's typical response to offenses likes those which Plaintiffs committed *is* to impose progressive discipline (or no discipline at all) on the involved flight attendant.  Ex. 2, *Deposition of Robert Krabbe*, at 29:24-31:8, 59:1-11; *see also* **RMMFs** ¶¶ 17, 59, 61.

2.      Union representative Ken Kyle testified that he was dismayed and surprised by the extreme severity of the discipline Defendant United imposed on Plaintiffs (immediate termination), based on his observations during United's investigation of Plaintiffs, decades of experience as a United flight attendant, and years of experience representing flight attendants facing potential discipline (including termination) from United, see Ex. 4, *Deposition of Ken Kyle*, at 3:10-4:19, 85:25-86:19; Kyle testified that the worst level of discipline he expected Plaintiffs to receive was level 4 (which falls short of termination), based on his observations and experience, Ex. 4, *Deposition of Ken Kyle*, at 41:11-42:20. United flight attendant William Knudsen testified that the level of discipline he would have expected Plaintiffs to receive for watching an iPad video during a portion of one flight was just a letter of warning (the lowest level of discipline on the progressive discipline track), based on his observations and experience acquired during his more than thirty years as United flight attendant; Knudsen also testified that United's typical disciplinary response to an offense of this nature is to counsel the involved employee, <u>not</u> to terminate them.  Ex. 8, *Deposition of Bill Knudsen*, at 43:1-44:2. The types of

offenses that United treats as meriting immediate termination (without any progressive discipline) are being drunk on the job, stealing from the airline, and outrageous and deliberate disregard for customer service and safety (such as punching a customer in the nose).  Ex. 8, *Deposition of Bill Knudsen*, at 43:1-44:2; Ex. 2, *Deposition of Robert Krabbe*, at 62:1-15.

3.      United's discipline policy that applies to its flight attendants can and generally does account for an employee's years of service, history of discipline, and history of positive performance.  Ex. 2, *Deposition of Robert Krabbe*, at 60:13-61:13.

4.      Ms. Stroup devoted her entire career to United, loyally and successfully working for the airline for approximately 35 years, including 29 years as a flight attendant.  Ex. 6, *Deposition of Jeanne Stroup*, at 232:21-13, Ex. 15, Depo Ex. 3, *Complaint and Jury Demand*; *see also* **SADFs** ¶¶ 7, 9-11.

5.      Mr. Lee devoted his entire career to United; he loyally and successfully working as a flight attendant for approximately 40 years. *See* **SADFs** ¶¶ 8-11.

6.      Mr. Lee's and Ms. Stroup's performance as United flight attendants was consistently excellent. *See* **SADFs** ¶¶ 7-11.

7.      United never received a customer complaint regarding Ms. Stroup during her whole career with United and, until November 2013, never formally disciplined her for any performance related-issues. Ms. Stroup's performance in all categories was consistently commendable. In recognition of her outstanding performance as a United flight attendant, Mrs. Stroup received numerous customer satisfaction memos during her tenure with the airline, along with multiple Certificates of Appreciation from United management for her top-notch customer service. United also gave Mrs. Stroup a number of awards for her superb attendance/dependability record. In 1978, just two years after graduating from high school, Mrs.

Stroup began working for United as a Reservation Representative in Denver. Despite her young age, Mrs. Stroup quickly earned respect and confidence from her subordinates and management. She had a particular knack for understanding the reservation computer system and complicated fare structures. As a result, Mrs. Stroup was promoted to the position of Technical Support Representative in 1982. Mrs. Stroup performed exceedingly well in this position for the next two years and received letters of praise from her supervisors and managers. In 1984, Mrs. Stroup decided she was ready for a new challenge at United, and applied for and received an internal flight attendant position based in Denver. As a flight attendant, Mrs. Stroup again proved herself to be a highly capable United employee. She was thorough and efficient, and had stellar safety and attendance records. Also, Mrs. Stroup was one of just a handful of her coworkers who returned to work immediately after the distressing events of September 11, 2001, while the safety of air travel was still very much in question.  Ex. 6, *Deposition of Jeanne Stroup*, at 232:21-13, Ex. 15, Depo Ex. 3, *Complaint and Jury Demand*; Ex. 26, Depo Ex. 53; Ex. 27, Depo Ex. 54, *Accolade for Jeanne Stroup for 28 Years of Service*; Ex. 28, Depo Ex. 55, *Accolade for Ruben Lee and Jeanne Stroup for outstanding service*.

 8. Mr. Lee also received multiple awards and prestigious assignments as a United flight attendant because of his top-notch customer service, enthusiasm, loyalty, and attention to safety issues. United never received a customer complaint regarding Mr. Lee during his tenure with the airline and, until November 2013, United never formally disciplined him for any performance-related issues. The exceptional service Mr. Lee reliably provided to customers kept him in the upper five percent of flight attendants receiving commendations from United passengers, known as "Orchid Letters." As a result, Mr. Lee also received numerous Certificates of Appreciation from his superiors at United. Mr. Lee began his long career with United

stationed in New York City, and received numerous prestigious assignments during this time.

For instance, Mr. Lee was given the important duty of modeling new flight attendant uniforms,

which involved taking time off from his regular flying schedule and traveling to Chicago to

present the uniform to the United Board of Directors. Additionally, Mr. Lee auditioned for and

was awarded the position of drummer for the Magnificent 7000 Road show. Mr. Lee and other

coworkers who were selected to be part of the show traveled around the United States for

roughly one year performing and representing United at inflight flight attendant meetings. Mr.

Lee received a silver chalice engraved with the moniker "The Magnificent 7000" for his

enthusiastic participation in the show, which was signed by then-President of United, Edward

Carlson. Subsequently, Mr. Carlson never failed to send Mr. Lee a Christmas card personally

signed by him and his wife until Mr. Carlson retired from the Company. In 1974, Mr. Lee was

working a flight from New York to Milwaukee as the number 3 flight attendant on a 727 QC, a

plane that carries cargo at night and converts to a passenger aircraft during the day, when the

crew discovered that the plane could not land normally because the nose gear would not deploy.

Consequently, the plane was diverted to Dulles International Airport in Washington, D.C., where

it made an emergency landing and slid to a stop. During this terrifying ordeal, Mr. Lee bravely

helped deploy the emergency slides and evacuate all the passengers to safety. United gave Mr.

Lee an award for his extraordinary performance. In 1975, United selected Mr. Lee to be the

Employment Representative assigned to help hire new flight attendants in Boston, New York,

and Newark. Shortly thereafter, Mr. Lee again distinguished himself by pioneering a new method

of cart setup for in-flight food and beverage services. United was so impressed by Mr. Lee's

initiative and innovation that the Company decided to implement his method in all its New York-

based domestic flights. Also in approximately 1975, United scheduled two special Anchorage

charter flights for VIPs of Standard Oil and Exxon, and four flights attendants per flight were

selected. Mr. Lee was chosen to work both flights. On April 7, 1976, Mr. Lee transferred to

United's Denver domicile. Shortly after Mr. Lee's transfer, the United Airlines Emergency

Training Team asked him to be an actor in the emergency procedures recurrent training videos.

Mr. Lee eagerly agreed to do so, and appeared in two widely-distributed videos. In 1984, Mr.

Lee was selected for a special assignment as Supervisor of Inflight Crew Resources, overseeing

Denver, Washington, and Cleveland's day-to-day operations for flight attendants. Mr. Lee's

responsibilities included issuing bid packages for flight attendants, scheduling hotels, and

supervising three crew schedulers. This prestigious assignment lasted six months.  At the end of

1985, United awarded Mr. Lee the Domicile Achiever Award for his work as a purser on DC 10s

and 747s. Then, from 1988 to 1991, United selected Mr. Lee to work the Denver Broncos

football team charters. It was a privilege to be one of the few flight attendants chosen to be part

of the Broncos' crew, especially considering that the Broncos played in two Super Bowls during

this time.  In 1990, United added the new Boeing 777 to its fleet. Because United management so

highly valued Mr. Lee's experience as a purser, he was asked to fly the purser position on an

FAA certification run of this new aircraft. Mr. Lee was subsequently selected to fly as a working

crewmember on the inaugural flight of the 777 from Washington to Chicago and Chicago to

Denver. For the remainder of Mr. Lee's career with United, he continued to consistently achieve

a high standard of performance with respect to all his job duties, including those related to both

safety and customer service.  Ex. 7, *Deposition of Ruben Lee*, at 42:1-46:8, 206:16-208:16, Ex.

15, Depo Ex. 3, *Complaint and Jury Demand*, Ex. 29, Depo Ex. 52, Ex. 28, Depo Ex. 55,

*Accolade for Ruben Lee and Jeanne Stroup for outstanding service.*

9.      Even during the few weeks preceding the September 20, 2013 flight, Plaintiffs earned – and United received – unsolicited praise from customers commending their customer service and overall performance; flight attendant William Knudsen (who flew with Mr. Lee and Ms. Stroup during that period) likewise praised their performance in September 2013.  Ex. 8, *Deposition of Bill Knudsen*, at 24:7-28:13, Ex. 31, DEF 2240, *E-Mail from Bill Knudsen to Ken Kyle*.

10.      Even during the September 20 flight *itself*, United did not receive a single customer complaint regarding Mr. Lee's or Ms. Stroup's performance, and fellow flight attendant William Knudsen wrote a letter *commending* their performance *throughout* September 2013 (which United received during its investigation of Plaintiffs, before firing them).  Ex. 1, *Deposition of Mark Dodge*, at 28:9-18; Ex. 31, DEF 2240, *E-Mail from Bill Knudsen to Ken Kyle*. That letter (at DEF 2240) stated in relevant part:

> I flew with 3 trips with Ruben and Jeanne in September. They were always professional, courteous and hardworking. Ruben made a point of greeting each passenger individually and even interacted with them beyond a simple hello. (One of my pet peeves is flight attendants who don't greet customers but are busy chatting with the pilots or me). We worked some cross country flights that month (SFO-PIT) and they were frequently in the aisle serving beverages and interacting with customers. Something which stood out in my memory of flying with them were the comments I received from customers as I was saying goodbye/thank you at the end of the flight. On nearly every flight there were several customers who would say, "Best flight I've had in a long time" or "Great crew". Sometimes they would even comment using Ruben and Jeanne by name so I knew they had made a great impression. This doesn't happen every month. (In fact so far this month no one had made any similar comments) I think they both exemplify what the "friendly skies" truly mean and I hope to fly again with them soon.

11.      During the September 20, 2013 flight, Plaintiffs' performance was overwhelmingly positive, as Mrs. Stroup and Mr. Lee capably performed the following key duties at all phases of the flight: (1) interacted with customers using positive interaction skills such as making eye contact and using pleasant facial expressions and tone of voice; (2) remained

visible in the cabin and accessible to customers wishing to capture their attention; (3) when traversing the aisle, they walked slowly and were available to customers; (4) promptly responded to customer and interphone call chimes; (5) resolved all situations within their control without placing blame on co-workers; and (6) provided customer service in an invariably courteous, helpful, competent, dependable, and business-like manner.  Ex. 7, Deposition of Ruben Lee, at 42:1-7; Ex. 15, Depo. Ex. 3, *Complaint and Jury Demand*.

12.     United decided to terminate Plaintiffs' employment despite their more than seventy years of combined service to the airline and overwhelmingly positive performance and attendance history, and despite failing to ever counsel them for performance issues or give them any chance whatsoever to improve their performance relating to the September 20 flight.

13.     United has articulated multiple, inconsistent explanations for deciding to terminate Plaintiffs; this supplies further proof of Defendant's age-discriminatory motive underlying its treatment of Plaintiffs. First, at Denver Inflight Supervisor Dodge's behest, San Francisco Inflight Supervisor Bagwe scrambled to find anything and everything United could use as a pretextual basis to terminate Mrs. Stroup's and Mr. Lee's employment because of their ages, while failing to report the many positive things he observed them doing during the September 20 flight even though he was supposed to be conducting a balanced "excellence review," not an unmitigated attack on Plaintiffs. Some of San Francisco Inflight Supervisor Bagwe's baseless initial charges were not even mentioned in Mrs. Stroup's and Mr. Lee's final Letters of Charge, such as his claim that Plaintiffs improperly failed to respond to a call from flight attendant William Knudsen, and improperly addressed a malfunctioning lavatory. *Compare* Ex. 5, Depo Ex 40, Bagwe's Report, *with* Ex. 33, Depo Ex. 13, *Jeanne Stroup's Performance Letter of Charge*, and Ex. 34, Depo Ex. 29, *Ruben Lee's Performance Letter of Charge*.  At times, United

also has asserted that a primary reason why Mr. Lee was fired was because he was dishonest

during the investigation (also untrue). *See* Ex. 12, Deposition of Dean Whittaker, at 97:16-21.

Yet, United's Position Statements to the EEOC entirely failed to articulate this supposedly

important (albeit pretextual) rationale. Ex. 35, *Jeanne Stroup's EEOC Charge* and Ex. 36, *Ruben*

*Lee's EEOC Charge*.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the record contains no evidence of a genuine

issue of material fact and demonstrates that the moving party is entitled to judgment as a matter

of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). "The party that moves for

summary judgment bears the burden of proving that no genuine issue of material fact exists on

all claims for which it seeks summary judgment." *Trujillo v. Atmos Energy Corp.*, No. 11-cv-

01151-RBJ-MEH, 2012 U.S. Dist. LEXIS 87273, at *4 (D. Colo. June 25, 2012). The Tenth

Circuit has emphasized that the nonmovant is given "wide berth to prove a factual controversy

exists." *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). In making this determination,

the district court must view the record and all reasonable inferences drawn therefrom in the light

most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 484 (10th

Cir. 1995). "Where different ultimate inferences may be drawn from the evidence presented by

the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifan Corp.*, 746

F.2d 1407, 1411 (10th Cir. 1984). Critically:

> The right to confront, cross-examine and impeach adverse witnesses is one of the
> most fundamental rights sought to be preserved by the Seventh Amendment
> provision for jury trials in civil cases. The advantages of trial before a live jury
> with live witnesses, and all the possibilities of considering the human factors,
> should not be eliminated by substituting trial by affidavit and the sterile bareness
> of summary judgment. It is only when the witnesses are present and subject to
> cross-examination that their credibility and the weight to be given their testimony

can be appraised. Trial by affidavit is no substitute for trial by jury which so long
has been the hallmark of "even handed justice."

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also*

*Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980).

## ARGUMENT

A jury could reasonably conclude based on admissible evidence that Defendant illegally
discharged Plaintiffs because of their ages, as explained below. Under the Age Discrimination in
Employment Act ("ADEA"), it is unlawful for any employer "to fail or refuse to hire or to
discharge any individual . . . because of such individual's age." 29 U.S.C. 623 (a)(1). The
protected class under the ADEA includes individuals "who are at least 40 years of age." 29
U.S.C. 631(a). Plaintiffs have the burden of establishing age discrimination by a preponderance
of the evidence. *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1425 (10th Cir. 1993). A
plaintiff establishes a *prima facie* case by showing that (1) the employee was within the
protected age group, (2) the employee was qualified for the position, (3) the employee suffered
an adverse employment action, and (4) the employee was treated less favorably than others
outside the protected class. *See Jones v. Okla. City Pub. Sch*, 617 F.3d 1273, 1279 (10th Cir.
2010). Plaintiffs face only a "slight" burden to establish a *prima facie* case. *See Orr v. City of
Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).

If the plaintiff establishes these elements, the employer has the burden to show it was
motivated by a legitimate nondiscriminatory reason for the challenged action. *Faulkner*, 3 F.3d at
1425. "Once the employer advances such a reason, the burden shifts back to the plaintiff to prove
the employer's proffered reason was pretextual." *Jones*, 617 F.3d at 1278. The employee need
not prove the employer's justifications were false, *Faulkner*, 3 F.3d at 1425, though proof that
the defendant's explanation is unworthy of credence can be probative of intentional

discrimination, *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147-48 (2000). Instead, the employee must show age was also a reason for the employer's decision, and "age was the factor that made a difference." *Faulkner*, 3 F.3d at 1425. "[T]his causal standard does not require[] [Plaintiffs] to show that age was the sole motivating factor in the employment decision." *Jones*, 617 F.3d at 1277. Importantly, pretext alone can prove that Defendant treated Plaintiffs less favorably than similarly situated employees outside their protected class because of their ages. *See, e.g.*, *Reeves*, 530 U.S. at 147-48.

I.      *__Prima Facie__ case*

    A.      **Ms. Stroup and Mr. Lee were qualified for their positions.**

Plaintiffs devoted their entire, decades-long careers to United until fall 2013, had never received a disciplinary write-up from United for performance issues before the events underlying this case, had never been placed on progressive discipline track for performance, and regularly earned accolades from coworkers, superiors, and customers throughout their consistently successful tenures with United – *including accolades from a satisfied coworker and customers for their performance in September 2013*. **SADFs ¶¶** 4-11. Indeed, Plaintiffs capably performed many of their key duties *during* the September 20, 2013 flight at issue. *Id.* ¶¶ 9-11. Thus, Defendant's contention that Plaintiffs were unqualified for their positions is meritless and, moreover, an improper basis for granting summary judgment because of Defendant's reliance on its self-serving, subjective evaluation of Plaintiffs based in part on disputed issues of material fact (*e.g.*, Lee smoking an e-cigarette) to support this misguided argument. *See Nguyen v. Gambro BCT, Inc.*, 242 F. App'x 483, 489 (10th Cir. 2007) ("an employer may not defeat a plaintiff's prima facie case by asserting that the plaintiff failed to satisfy subjective qualifications[]"); *see also Barone v. United Airlines, Inc.*, 355 F. App'x 169, 180 (10th Cir.

2009) ("We emphasize that the burden of establishing a *prima facie* case is 'not onerous.'") (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

**B.**      **Defendant constructively discharged Ms. Stroup and Mr. Lee.**

Constructive discharge is an adverse employment action. To establish constructive discharge, Plaintiffs must show that the "abusive working environment became so intolerable that [their] resignation[s] qualified as a fitting response[.]" *See Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004). "An offer of early retirement may constitute constructive discharge if the employee demonstrates each choice facing the employee makes him worse off, and if he refuses the offer and decides to stay, his employer will treat him less favorably than other employees because of age." *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 993 (10th Cir. 1994) (quotation and citation omitted). "More simply stated, an offer of early retirement constitutes a constructive discharge when the choice is essentially either early retirement or continuing to work under intolerable conditions, like the threat of termination without benefits." *Smith v. World Ins. Co.*, 38 F.3d 1456, 1461 (8th Cir. 1994) (emphasis added).

Defendant United constructively discharged Mr. Lee and Ms. Stroup because the Company threatened to terminate them immediately and Plaintiffs thought that this would eliminate their eligibility for (at least) United's retiree medical and travel benefits. **RMMFs ¶¶** 41-51; *Smith*, 38 F.3d at 1461; *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1113 (1st Cir. 1989) (a plaintiff who has accepted an employer's offer to retire can be said to have been constructively discharged when the offer presented was "a choice between early retirement with benefits or discharge without benefits," or, more starkly, an "impermissible take-it-or-leave-it choice between retirement or discharge[]"); *see also Barone v. United Airlines, Inc.*, 355 F. App'x at 186 (reversing district court's grant of summary judgment to defendant United, and

holding that jury could reasonably conclude that the plaintiff was constructively discharged because "Barone faced more than the mere *possibility* of employment consequences. Barone's supervisor and a senior human resources officer made it completely apparent that should she not immediately resign from her position, she faced a definite and immediate demotion and transfer[]") (court's emphasis).

Further, given heightened scrutiny and sham "investigation" Plaintiffs had just experienced at United because of their ages, along with the more pervasive ageism at United (*see,.e.g.*, **RMMF** ¶ 59),[4] the appeal process likely would proven biased against Plaintiffs as well and, therefore, likely been a quixotic journey that changed nothing.[5] Indeed, multiple witnesses in this case testified that they had *never* observed or heard of a United flight attendant pursuing a successful grievance. **RMMF** ¶ 50. This amplifies the conclusion that Plaintiffs had no viable alternative to retiring as a result of the intolerable work conditions created by United's discriminatory acts. *See James*, 21 F.3d at 993. And, regardless of the outcome of any appeal, Plaintiffs believed they would be treated as terminated employees during the year or more their appeals were pending, meaning that they would lose their retiree medical benefits along with retiree pass privileges during this protracted period. **RMMF** ¶ 42.

Also notable, Defendant United gave Plaintiffs just *one* business day to "decide" whether to retire or be fired, and AFA representative Ken Kyle strongly advised Plaintiffs to make their

---

[4] Because a jury question exists regarding at least Whittaker's and Dodge's age-discriminatory motive in ordering Bagwe to scrutinize Plaintiffs' conduct alone during the fight, Bagwe's age-discriminatory motive during the flight, and Bagwe's, Dodge's, and Whittaker's age discriminatory motives in their subsequent dealings with Plaintiffs, Defendant is wrong to contend to that "Plaintiffs' working conditions were not made intolerable *by* alleged discrimination." *See* Doc. 67 at 25-27 (Defendant's emphasis); **RMMF** ¶ 4; *see also* **RMMF** ¶ 59 (third-party witnesses describing their own observations of age discrimination at United).
[5] *See Thomas*, 48 F.3d at 484 (district court must view the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party).

decisions as quickly as possible in light of the ultimatum United relayed to him. *Id.*; *Gower v. IKON Office Solutions, Inc.*, 177 F. Supp. 2d 1224, 1233 (D. Kan. 2001) (claim of constructive discharge supported by evidence that the worker was given twenty-four hours to sign a new contract limiting the number of accounts he could service, reducing his commission in one account from $ 8,000 to $ 3,000 per month, and changing his reporting requirements); *Goodwin-Haulmark v. Menninger Clinic, Inc.*, 76 F. Supp. 2d 1235, 1239 (D. Kan. 1999) (overt pressure to resign raised genuine issues of material fact to justify denial of summary judgment regarding constructive discharge). Ms. Stroup, in turn, requested more time or at least explanation from Dean Whittaker but he deliberately ignored her. Thus, United presented a Hobson's choice to Plaintiffs and further "turned the screws" by deliberately creating a duress-inducing timeframe to make their illusory "choices." **RMMFs** ¶ 41-42, 57-58; *Stewart v. Gates*, 786 F. Supp. 2d 155, 169 (D.D.C. 2011) (upholding finding of constructive discharge where employer gave employee an offer of "early retirement" and "threatened to 'turn the screws' and 'build a record' against [him] if he did not resign").

Defendant wrongly accords weight to Plaintiffs' testimony that they may have had an "option" available to them besides immediately retiring. The Tenth Circuit rejected a similar argument in *Barone v. United Airlines, Inc.*, 355 F. App'x at 185, stating:

> [T]he district court emphasized how Barone's own testimony described her options as a "choice," how her request for reinstatement was inconsistent with her claim of intolerable working conditions, and how Sprague's and Mortimer's offensive behavior did not meet this standard. We disagree with this analysis because it improperly considered Barone's subjective views, which we have held are irrelevant to the constructive discharge inquiry, see PVNF, 487 F.3d at 806 n.10 ("This [objective] standard cuts both ways--just as an employee's subjective feelings that her working conditions were intolerable is not controlling . . ., neither is an employee's desire to continue working despite conditions so intolerable any reasonable employee would have long since quit."), and it failed to assess how the options United presented Barone impacted her working conditions.

The authority Defendant's Motion for Summary Judgment primarily relies upon is also inapposite here. In *IOSTAR Corp. v. Stuart*, 2009 U.S. Dist. LEXIS 9476 (D. Utah Feb. 2, 2009) (a nonbinding District Court case from outside Colorado), the defendant never threatened to terminate the plaintiff. To support his wrongful discharge claim, the plaintiff contended that "[he] felt [he] could not take part in D'Ausilio's actions and was forced to resign as President[.]" *Id*. at *57. But the evidence did not indicate that "Mr. D'Ausilio ever asked or required him to participate in any illegal, unethical, or inappropriate conduct." *Id*. at *59. Furthermore, the plaintiff did not show "that Mr. D'Ausilio's actions interfered with his ability to perform his job or that Mr. D'Ausilio's conduct exposed him to any liability. Finally, Mr. Stuart has not claimed that Mr. D'Ausilio's actions made working conditions difficult, uncomfortable, or unbearable." *Id*. Plainly, the facts in *IOSTAR* are miles apart from those here. Further, unlike the plaintiff in *IOSTAR*, a genuine dispute exists as to whether United terminated Plaintiffs for a lawful reason. That is because evidence shows that Defendant trumped up Plaintiffs' trivial disciplinary infractions from a single flight to create a pretextual basis for illegally terminating these successful, loyal, and highly-experienced employees.

The facts in *Haney v. Preston*, 2010 U.S. Dist. LEXIS 135543 (D. Kan. Dec. 22, 2010) (another nonbinding District Court case from outside Colorado) are nothing like those here either. There, the "[p]laintiff allege[d] that because of Tomlin's harassment, she was forced to take leave because of her stressful work environment. She argue[d] that she was faced with the choice of returning to the work environment that caused her depression, or retiring. Because her health was the only reasonable choice, she claim[ed] she was constructively discharged." *Id*. at *44. The court also observed: "Instead of retiring, it appears that plaintiff had several choices: she could have chosen to comply with Tomlin's request and provided the medical documentation

and remained at home; she could have refused to comply and faced the possible consequences of that choice; she could have waited for her formal complaint to be processed; or, she could have waited for her temporary assignment to the Intake Branch to expire. As defendant notes, plaintiff had already filled out her retirement papers on March 25, 2003, before she received any of Tomlin's Five Memos." *Id*. at *45-46. In contrast, Defendant United presented Plaintiffs with a stark and time-sensitive ultimatum: retire immediately or be terminated. **RMMFs ¶¶** 41-51.

A much more analogous case here is *James*, 21 F.3d at 993, where evidence presented at trial showed that plaintiffs "were singled out among similarly situated employees and pressured about quotas in a way younger employees were not[,]" and then "written up" over quotas even though the quotas were almost never met by other salespersons. While the plaintiffs in *James* fell short of certain so-called performance standards, the Tenth Circuit nonetheless concluded that the former employer's conduct could be considered age discrimination because the employer subjected the plaintiffs to less favorable terms and conditions of employment compared to their younger counterparts. *Id*.

Ultimately, the plaintiffs there "had a choice between two options: lose benefits under early retirement; or continue to work while being harassed or moved to jobs where unreachable quotas could be used as a pretext for firing them. None of the [p]laintiffs was offered a choice of continuing work at the same pay or accepting the buy-out or early retirement." *Id*. The court concluded that, "[v]iewing the evidence in the light most favorable to [p]laintiffs, the jury heard sufficient evidence to find the treatment meted out to [p]laintiffs constituted aggravating circumstances that would cause a reasonable person in their position to feel compelled to accept the buy-out/early retirement and  leave." *Id*. at 993-94. Likewise, the discriminatory treatment meted out to Mr. Lee and Ms. Stroup because of their ages, paired with the fact that retiring

presented a less onerous "option" for them both, renders Plaintiffs' compelled retirement an adverse employment action as a matter of law. The evidence shows that United's extraordinarily time-limited "offer" for Plaintiffs to retire "was nothing more than a charade, that is, a subterfuge disguising the employer's desire to purge plaintiff from the ranks because of [their] age." *See Vega v. Kodak Caribbean*, 3 F.3d 476, 480 (1st Cir. 1993).

C.   **Defendant treated Plaintiffs less favorably than others outside their class.**

The evidence shows that Defendant United subjected Plaintiffs to heightened scrutiny because of their ages, trumped up the minor infractions they committed because of their ages, and then forced Plaintiffs to retire because of their ages. As an initial matter, United's sudden discharge of Ms. Stroup for a relatively minor and aberrational offense at the age of 55, after 30+ years of consistently successful employment, supplies proof of age discrimination in and of itself. **SADFs** ¶¶ 7, 9-11. So too does the abrupt termination of Mr. Lee for a relatively minor and aberrational offense, even though he had loyally devoted his entire career to United until that time, and successfully worked as a domestic flight attendant for approximately 40 years. *Id*. ¶¶ 8-11.

Secret flyer Bagwe's written report (which Supervisor Dodge subsequently approved) about Plaintiffs' alleged conduct during the September 20 flight lays bare Defendant United's age-discriminatory motive underlying its treatment of Plaintiffs, as Bagwe's report contains blatantly ageist language, including his description of a passenger as an "old lady." *See* **RMMF** ¶ 4. Further proof that United discharged Plaintiffs because of their ages comes from United's pattern or practice of forcing senior flight attendants to retire and replacing them with younger employees. **Id.** ¶ 63; *Jones v. UPS, Inc.*, 502 F.3d 1176, 1188-89 (10th Cir. 2007) (pattern-or-practice evidence can be used as circumstantial proof of discrimination within the *McDonnell*

*Douglas* burden-shirting framework). The evidence also shows that Defendant subjected its older employees, including Plaintiffs, to heightened and unwarranted scrutiny compared to their younger counterparts. *Id.* ¶¶ 4, 8-9, 12, 17, 37, 59. This includes but is not limited to Whittaker's decision to issue a Performance Letter of Warning to Denver-based flight attendant Meredith Broome (who was several years younger than Plaintiffs Stroup and Lee) as opposed to firing her even though she was so intoxicated and behaving so inappropriately during a layover that she had to be handcuffed and transported by ambulance for treatment. *Id.* ¶ 59. Moreover, Deepesh Bagwe admitted during his deposition that the only time he had been ordered to scrutinize just certain flight attendants as part of a secret flyer mission, and the only time his secret review had led to a United employee being fired, was his surreptitious review of Plaintiffs on September 20, 2013. *Id.* ¶ 4. Bagwe testified during his deposition that he had conducted a total of fifty "unannounced excellence reviews" at the time. *Id.*

Plaintiffs are <u>not</u> the only Denver-based flight attendants who have observed or experienced United subjecting its older employees to age discrimination. *See, e.g.*, *Id.* ¶ 59. As third-party witness Greg Stroup attests in his sworn statement:

> United has engaged in a pattern of hiring and firing practices that favor younger employees and disfavor older ones. It was clear from my observations that United wanted to have a certain stock of flight attendants who are mostly young, thin, and relatively attractive, and if you did not fit what it wanted, that person needed to learn to protect themselves. . . . It was my observation that no one was totally and completely safe from United management or from the risk of being terminated, but United especially closely watched and nitpicked the performance of older flight attendants - like Jeanne and Ruben. I also observed United discriminating against older flight attendants for taking their sick time. Flight attendants, at least when I worked there, received 4 hours of sick time a month and many flight attendants banked many hours over the years. It was our right to use those but if you called more than twice a year to use sick time, United really harassed you. Older flight attendants tend to have more medical issues, and need to take more sick time as a result. But instead of being compassionate with the older attendants, United used that as an excuse to discipline them. In my

observation, it is more of a problem for United the older an attendant happens to be.

*Id.* Former Denver-based flight attendant Kimberly Salazar also avers in her sworn statement: "There is absolutely an age bias that exists at United. It seems that senior flight attendants over the age of approximately 50 have been victims of particular scrutiny from management." *Id.* Craig Meadows, another now former Denver-based flight attendant, likewise asserts under oath that, around the start of the year 2013, he observed that he became vulnerable to being fired by United for some insignificant offense, despite his decades of experience and excellent performance history. *Id.* Mr. Meadows was 63 years old at the time. *Id.*

United's Motion for Summary Judgment accords excessive weight to Plaintiffs' honest admission that they violated a few minor rules during one flight. Plaintiffs can still demonstrate age discrimination in a variety of ways, including pretext alone (further discussed below), and being "treated differently than other similarly situated employees who violated work rules of comparable seriousness." *See Richardson v. Topeka Metro. Transit Auth.*, 987 F. Supp. 887, 892 (D. Kan. 1997). The plaintiff in *Richardson*, 987 F. Supp. 887 committed more substantial rule violations than Mr. Lee or Ms. Stroup did here, but the court nonetheless denied defendant's motion for summary judgment. This was in large part because

> [Plaintiff] testifies that none of the other clerks were disciplined for routinely accepting checks from customers listed on the "bad check" bulletin, which, the court agrees, would amount to a work rule violation of comparable seriousness. Plaintiff also testifies that other clerks were not disciplined for violating the opening and closing procedure by using the amount of one day's closing balance as the next day's opening balance without actually recounting the money. Although she does not expressly state that her supervisor was aware of this practice, all reasonable inferences must be drawn in favor of plaintiff, and it is not unreasonable to impute such knowledge to an immediate supervisor. Finally, plaintiff presents enough evidence to raise a material question regarding the similarity between the circumstances surrounding numerous late bank deposits for which, it appears, only she was disciplined.

*Id.* at 893. Few if any long-term, full-time employees have flawless records and, for that reason, a key question here is whether United subjected older employees like Plaintiffs to more stringent disciplinary standards than Plaintiffs' similarly situated younger coworkers, because this supplies proof of Defendant's discriminatory motive. The evidence shows that this is exactly what happened and, therefore, dismissal of Plaintiffs' claims is improper. **RMMFs ¶¶ 4, 8-9, 12, 17, 21, 37, 59, 61; SADFs ¶¶ 1-11.**

## II.      Defendant's purported basis for terminating Plaintiffs is pretext for illegal discrimination.

The evidence also persuasively shows that Defendant United's alleged basis for discharging Plaintiffs is pretext for illegal age discrimination.[6]  Pretext can be established in various ways, *Thornton v. Morgan Stanley Smith Barney, LLC*, 2014 U.S. Dist. LEXIS 183756, at *35-36 (N.D. Okla. Nov. 26, 2014), including proof that the employer's proffered explanation is "unworthy of credence." *See Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994) (internal citations omitted); *see also Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (pretext may be demonstrated by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons"). "A

---

[6] Defendant claims in its motion for summary judgment that it had legitimate business reasons for discharging Plaintiffs [Doc. 67 at 32-33], but a disputed issue of material fact exists as to whether Defendant's stated reasons for its actions are the true reasons, or instead illegal pretext. If United discharged Plaintiffs because of their ages (as the evidence certainly *could* reasonably be interpreted to show), that would not a legitimate and lawful explanation for United's challenged conduct, and a court – and jury – would be entitled to second guess Defendant's so-called business judgment. *See Sanderson v. Leavitt Grp. Ins. Advisors*, 2015 U.S. Dist. LEXIS 120737, at *21-22 (D. Utah Sep. 9, 2015) ("Of course, a company may replace its employees with what it perceives to be better-qualified employees. However, when the company bases its hiring and firing decisions on age, it implicates the ADEA.").

plaintiff may not be forced to pursue one particular means of proving pretext[.]" *Thornton*, 2014

U.S. Dist. LEXIS 183756, at *35.[7]

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves*, 530 U.S. at 147-48 (citations and quotations omitted, and emphasis added). As the Tenth

Circuit further explained in *Jones*, 617 F.3d at 1280:

> In *Reeves*, the Supreme Court rejected the so-called "pretext plus" standard that required plaintiffs using the *McDonnell Douglas* framework to both show pretext and produce "additional evidence of discrimination" in order to avoid summary judgment. *Id.* at 146-48. *Reeves* expressly held that "a plaintiff's *prima facie* case [of discrimination], combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. No additional evidence is necessary to show discrimination because "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination." *Id.* at 147.

> Consistent with *Reeves*, the Tenth Circuit has "definitively rejected a 'pretext plus' standard." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007). Consequently, "once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." *Bryant*, 432 F.3d at 1125. A plaintiff produces sufficient evidence of pretext when she shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or

---

[7] Thus, Defendant erroneously contends that Plaintiffs must provide direct evidence that they were treated differently from other similarly-situated employees who violated work rules of comparable seriousness in order to prevail. *See Thornton*, 2014 U.S. Dist. LEXIS 183756, at *36; *see also* Doc. 67 at 30-32.

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005). When evaluating the sufficiency this evidence, we look to several factors, "includ[ing] the strength of the [employee's] *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" on a motion for summary judgment. *Reeves*, 530 U.S. at 148-49.

Put differently,

> [t]he Tenth Circuit is not a "pretext plus" circuit. *Swackhammer*, 493 F.3d at 1168 ("However the plaintiff may choose to demonstrate pretext, we have definitively rejected a 'pretext plus' standard."). This means that Plaintiff need not show both that the proferred reason was pretextual *and* that the real reason for her termination was [age] discrimination. *Id.* <u>If pretext is shown, the trier of fact can reasonably infer from the falsity of the explanation that the employer is covering up a discriminatory purpose.</u> *Id.* ("[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.").

*Thornton*, 2014 U.S. Dist. LEXIS 183756, at *35 (court's emphasis in part; underlining added by Plaintiffs).

Here, Defendant United demonstrably manufactured a sham basis for terminating Mr. Lee and Ms. Stroup – both of whom were overwhelmingly successful, decades-long employees of United – by seeking to catch them in particular committing minor rule violations that were commonplace among all employees because of their ages, and then failing to give Plaintiffs a meaningful opportunity to contest their charges, instead essentially ignoring Plaintiffs' candid acceptance of responsibility for the insignificant offenses they committed on September 20, and their distinguished histories of service to the airline. **RMMFs ¶¶** 4, 8-9, 12, 17, 21, 37, 59, 61; **SADFs ¶¶** 1-11. Defendant United also failed to provide Plaintiffs with any real chance to improve their performance after informing them that their conduct on September 20, 2013 violated United policy. **RMMFs ¶¶** 17, 59, 61; **SADFs ¶¶** 1, 12

44

Additionally, Defendant United allowed more than one month to elapse between when Dodge claimed to have received a complaint from a flight attendant regarding Plaintiffs' purported inattention to cabin safety (by watching an iPad video during part of another flight), and when Defendant United first attempted to do anything at all about it (by ordering Bagwe to secretly watch Plaintiffs during flight), even though Plaintiffs had been flying regularly during that whole month. *See, e.g.*, **RMMF ¶** 4. A jury is thus entitled to disbelieve Defendant's assertion that Plaintiffs committed termination-worthy offenses because they so "egregiously" compromised customer safety by watching an iPad video, as Defendant United did nothing in response to this purportedly "grave" safety concern for several weeks. ***Id.***

Moreover, United has proffered multiple irreconcilable bases for discharging Plaintiffs; this further demonstrates pretext. **SADF ¶** 13. So too does the fact that key players in Plaintiffs' forced terminations have provided utterly contradictory testimony regarding material issues in the case, including who ordered Bagwe to monitor Plaintiffs during the September 20 flight, and the actual severity of the offenses Plaintiffs committed during that flight. **RMMFs ¶** 1, 4. Likewise, Director of Inflight Services Denver/New York Dean Whittaker testified falsely under oath regarding whether he had or had not made the decision to terminate Plaintiffs. **RMMF ¶** 41. Bagwe also testified falsely regarding Lee's purported smoking of an e-cigarette and standing sideways during the pre-flight safety demonstration to try to help United build a pretextual basis for terminating Plaintiffs. **RMMF ¶** 12; *Newmaker v. City of Fortuna*, 2016 U.S. App. LEXIS 20932, at *20 (9th Cir. Nov. 22, 2016) ("Because this case 'requires a jury to sift through disputed factual contentions' — including whether the officers were telling the truth about when, why, and how Soeth shot Newmaker — summary judgment was inappropriate.") (internal citations omitted); *see also Jones v. Barnhart*, 349 F.3d 1260, 1265-66 (10th Cir. 2003) ("We

recognize that at the summary judgment stage credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. In this procedural posture, therefore, our role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim.") (quotations and citations omitted).

For decades, neither Ms. Stroup nor Mr. Lee ever received a disciplinary reprimand from United for performance issues, but they did repeatedly earn unsolicited praise from customers, coworkers, and superiors, *including praise for their performance in September 2013*. **SADFs ¶¶ 1-11**. Thus, any performance or disciplinary issues Plaintiffs may have had before their forced retirements were inconsequential outliers, and should have been met with good-faith performance management, not an ultimatum to retire or be fired. *Id.* **¶¶ 1-12**. As longtime United flight attendant Craig Meadows avers under oath: "I have never observed or heard of United management firing otherwise solidly-performing flight attendants for such relatively minor infractions [as Plaintiffs committed] without proper steps of disciplinary actions first. If that's the leg United is standing on to defend its decision to fire Ruben or Jeanne Stroup - this is really unfair and hard to believe, based on my observations and experiences at United." **RMMF ¶ 17**. Performance management is Defendant United's typical response to nearly all performance deficiencies, and discriminatory procedural irregularities, such as deviation from a normal progressive discipline policy or practice, allow a jury to infer disparate treatment and establish pretext. **RMMFs ¶¶ 12, 17-18, 21, 59, 61; SADFs ¶¶ 1-3;** *Mohammed v. Callaway*, 698 F.2d 395 (10th Cir. 1983).

## CONCLUSION

Because there are myriad disputed issues of material fact and credibility judgments that a jury must make, summary judgment in favor of Defendant United is improper. Because a jury could reasonably infer on the basis of pretext alone that Defendant discharged Plaintiffs because of their ages, summary judgment in favor of Defendant United is improper. *See Reeves*, 530 U.S. at 147-48. Because additional evidence also shows that Defendant United subjected Plaintiffs to illegal age discrimination, including sworn testimony from multiple third party witnesses describing their observations of age discrimination at United, and statistics demonstrating that the percentage of Denver-based flight attendants under 40 years of age more than tripled during the two years after Defendant forced Plaintiffs to retire, summary judgment in favor of United is improper. Thus, Defendant's Motion for Summary Judgment must be entirely denied.

Respectfully submitted this 17th day of January, 2017.

KILLMER, LANE & NEWMAN, LLP

*s/ Michael P. Fairhurst*
David A. Lane
Michael P. Fairhurst
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
mfairhurst@kln-law.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on this 17th day of January, 2017, I filed this **PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** via CM/ECF, and CM/ECF will generate a Notice of Electronic Filing to the following:

Meghan W. Martinez
Ann C. Purvis
720 South Colorado Boulevard

South Tower, Suite I 020
Denver, Colorado 80246
Telephone: (303) 597-4000
Fax: (303) 597-4001
martinez@mlgrouppc.com
purvis@mlgrouppc.com
reinhardt@mlgrouppc.com
Attorneys for Defendant

*s/ Jamie Akard*
Jamie Akard